RHODA E. HENNINGS, PERRY B. AYLER, WARNER AYLER, JULIA BURN-
HAM, MAE CRONIN and MILLIE ABERCROMBIE v. JAMES A. HALLAR,
Executor of the Estate of JOHN P. AYLER, and JESSE E. LUDLAM,
Appellants.—149 S. W. (2d) 338.

Division Two, April 3, 1941.

*Musser & Musser, Farrar & Phillips* and *M. D. Aber* for appellants.

*T. C. Owen* and *John S. Bates* for respondents.

TIPTON, P. J.—This is an appeal from a judgment of the Circuit Court of Johnson County, Missouri, setting aside the will of John P. Ayler, dated September 7, 1938. Throughout this opinion the proponents will be referred to as the appellants, while the contestants will be referred to as the respondents.

Respondents have filed a motion to dismiss this appeal for the reasons that appellants' brief does not comply with Section 1060, R. S. Mo. 1929, and our Rule 15, in that it does not contain a clear and concise statement of the facts, and that the assignments of error and points and authorities do not separately and distinctly enumerate the errors which appellants contend the trial court committed. The statement sets out the substance of the pleadings with a synopsis of the testimony of each witness. Some of the assignments of error and points and authorities are too general and are subject to respondents' contention, but the question as to whether the demurrer to the evidence should have been sustained is sufficiently stated to review the evidence. The motion to dismiss is therefore overruled.

The court's instructions withdrew from the jury the issue of undue influence and submitted the case on the issue of mental capacity. Was there any substantial evidence to support the verdict and judgment setting aside the will?

This necessitates a rather full statement of the facts bearing upon the question of mental capacity of the testator, who died October 11, 1938, at the age of nearly eighty-one. This testator and his younger brother William lived together and neither was married. William died in the year of 1930, leaving the bulk of his estate to the testator. Testator owned 771 acres of land in Johnson County, Missouri, and some real estate in Kansas at the time of his death. After the death

of his brother William, testator continued to live alone on the farm formerly occupied by them until September 3, 1938, when, by reason of distress caused by urinary retention, he went to Holden and consulted a physician, Dr. W. G. Thompson, who took him to a hospital in Kansas City, Missouri. His will was drawn by J. Walter Farrar, a Kansas City lawyer, and was executed on September 7, 1938. This will gave $5 to his sister Rhoda E. Hennings, $5 to his brother Perry B. Ayler, and the residue of his estate to Jesse E. Ludlam, who had for several years rented parts of testator's land and was at that time engaged in a joint enterprise with testator in feeding cattle. The will was probated in the Probate Court of Johnson County in October, 1938.

Farrar testified that he wrote the will at the specific directions of the testator; it was carefully read over to testator; it was fully understood by him; he signed both sheets of paper on which the will was written; he had known testator about fifty years and he was during all that time a self-reliant, hard headed business man and was so at the time the will was executed; and that the will was signed by this witness and Frank Herrington, who died shortly before the trial, as witnesses, in the presence of the testator.

On behalf of respondents there was evidence that tended to show that testator was one of a family of four sons and two daughters. Two of the brothers and one sister predeceased the testator. There was testimony to the effect that testator had on several occasions since the death of his brother William expressed a purpose to leave his property at his death to his heirs at law.

Rhoda Hennings testified that she was the sister of testator; she went to see him the day after he entered the hospital; she told him who she was but he did not answer and he looked like he did not know anything.

George Hennings, husband of Rhoda Hennings, testified to the same effect.

Albert Dean testified that he saw testator in the hospital on October 2, 1938, and that he did not know the witness until he told him who he was. On cross-examination he testified that when the testator was aroused, he talked intelligently and he saw no difference in his mental condition from that which it had always been.

Bernita Shackleford testified that she went to the hospital September 10, 1938, to see her uncle, the testator; it would be hard to tell how he was as he had taken a lot of medicine; the nurse told her to talk to him but for him not to talk; he did not talk much and she did not remember anything in particular he said.

John Shackleford testified that he did not think testator's mind was "just right" for a year before his death, and he based his conclusion on the fact that he was forgetful, and, also, that testator told him he had tried to get several young girls to marry him.

Julia Burnham testified that she was a niece of testator; she went to see him on October 4, 1938; she asked him if he knew her, to which he replied: "Sure, I know Julia;" and he was apparently in a stupor for that was all he said.

Harry Wright testified that he rented some property from testator, located in Kansas. On September 8, 1938, he went to the hospital to see testator and told him he was going to Texas but he had a man who wanted to rent testator's house, and he took $10 to him as payment on the rent. The witness wrote out a receipt and told him he would have to sign it. The witness had to read the receipt three times to testator before he understood; he then signed it.

Goldie Wright's testimony was similar to that of her husband.

Respondents had no medical testimony tending to show the mental condition of testator. In rebuttal, they offered Dr. O. B. Hall, but his testimony was stricken from the record because it was not properly rebuttal evidence. The record shows that if Dr. Harkless had testified he would have testified to the same state of facts but that it would also have been excluded because it was not rebuttal testimony.

By agreement of parties, the hospital records were admitted in evidence. They show the condition of testator, as follows: "9-4 Retention catheter in place. Rectal examination revealed large prostate. Patient upset this evening. Threatened orderly with knife. Had maniacal phase. Thought he was going to be operated tonight and was afraid to sleep and threatened to leave. Refused everything per os. (Meaning mouth.) Given somnose. Sleeping."

The records for September 5th, 6th, 7th, 8th and 9th show his temperature, pulse, the medicine he took, the amount he ate and drank, and the amount of urine and bowel movement. But they were all within the normal range and nothing was shown that did not indicate that he was mentally normal. In fact, the records were about the same until a few days before his death.

Appellants had testimony to the effect that testator had made a statement that he did not intend to leave property to any of his relatives.

Dr. Park Neil had testator in his professional care, seeing him several times on September 3rd, and thereafter morning and evening. He explained the chart and described his mental condition up until testator's death. He testified that on "the morning of the 5th he seemed to be mentally clear and aside from the notes here that he talked loudly, which I might modify by saying that I went to the hospital to see him and Mr. Ayler had the impression that he was going to be operated on that night, and he had a very strong aversion to being operated on, he didn't propose to be cut on to be brief, and I talked to him and told him that we had no intention of operating that night or any other time until we had made complete examination of him, and after I had fully explained that to him and had obtained

his permission, I told him we wanted to do a cystoscopy, and I told him that was the introduction through the penis of an instrument, about the size of a lead pencil into the bladder, which carried on it a light and a small mirror and it was possible to turn this in various directions so the entire interior of the bladder could be seen.''

He further testified that on September 7th (the date of the will) he was present when Farrar was in the room and that testator awoke, alert and in full possession of his mental faculties and continued that way until a few days before his death. He testified that testator was not given any narcotics.

Ella Bogan testified that she was the nurse who attended the testator and that he was mentally normal until a few days before his death and conversed intelligently at all times.

Dr. Luke Dlabel testified that he was an interne at the St. Joseph's Hospital, and that on the day the will was executed testator's mental condition was normal and continued normal until a few days before his death. He testified that ''the common retention of the bladder of a person his age and size usually is around a pint. He had double the normal distention. The natural tendency of the kidneys is blocking, they empty into the bladder, and they have to secrete against pressure. What happens when the kidneys retain all they are going to is that there is perhaps a retention of toxic produced in the urine in the blood stream. It is retained in the blood. The toxic effect of urine in the blood is to produce a condition called uremia. That is poisonous to the system. In a strong, healthy man, it likely would take from 24 to 30 hours to remove that toxic effect, somewhere along that. It would take slightly longer to remove the effects from an old man 81 years old in the condition he was in, but not much longer. You could check that by blood chemistry. After the urine was removed by the catheter he had passage the rest of the time. We inserted a retention catheter. He drained freely.''

''Q. Look at the chart and tell from the blood chemistry when the uremia had passed away on this patient? A. According to this chart there isn't anything here to show he had much damage or much toxic produced in the blood because of the urine retention, for the blood chemistry for the most part is within the range of a normal person and there wasn't much for him to have to do to come back to normal after it was drained off.

''Q. Was he back to normal in 24 to 36 hours? A. The blood chemistry was done on the 3rd when he came in and it was normal at that time with the exception of having a slight uric acid, and further down the list the next blood chemistry was the 11th, which shows the blood practically normal at that time.

''Q. Will you look at the chart on the 7th and from your recollection state his mental condition at that time? A. On the 7th?

''Q. Yes. A. His mental condition on the 7th so far as I can tell was normal.

"Q. State if that is in accordance with your recollections? A. That is right."

Dr. W. G. Thompson testified that he was a physician living at Holden, Missouri; he took testator to St. Joseph's Hospital and called Dr. Park Neil; testator's mental condition was perfectly normal; he saw him again on September 5th and his mental condition was normal; he also saw testator September 8th, 12th, 15th and 22nd and at these times his mental condition was normal. He testified in regard to the hospital record of September 4th as follows: "Q. Now, to get this clear on the matter of the 4th, you say those actions, or reactions are a result of the emptying of the distended bladder? A. That is not an uncommon thing to occur.

"Q. How long would that condition last? A. Three or four hours, maybe not so long, maybe 24 hours at the outside."

He further testified that he did not see testator any time after September 29th but at no time that he saw him did he have any mental disturbance.

There were many lay witnesses who were neighbors of testator who expressed opinions that his mental condition was normal.

■ We have come to the conclusion that there is no substantial evidence to support the verdict of the jury. It is a question of his mental capacity at the time of the execution of the will. While evidence as to his mental condition before and after the execution of the will is admissible, it has no probative value unless it raises an inference as to testator's mental condition at the time of the execution of the will. We judicially know that a person may be unconscious one moment and fully conscious and sane shortly thereafter. Extreme old age, with its attendant physical and intellectual weaknesses, does not, of itself, incapacitate the testator and raises no presumption of his not having a disposing mind, if he is able to transact his ordinary business, and is capable of understanding the extent of his property and appreciates the natural object of his bounty. [Nute v. Fry, 341 Mo. 1138, 111 S. W. (2d) 84; Whitacre v. Kelly, 345 Mo. 489, 134 S. W. (2d) 121.] Nor does the mere fact that a testator has an imperfect memory, is forgetful of names of persons, requires the repetition of questions, any evidence of such mental disease that will render him incapable of making a will. [Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772.]

■ An unnatural disposition by will tends to discredit the maker's testamentary capacity, yet if the evidence shows that the testator was of sufficient capacity at the date of execution to comprehend its import, the testator may dispose of his property to whom he pleases, even to the exclusion of his heirs at law. [Meier v. Buchter, 197 Mo. 68, 94 S. W. 883, 6 L. R. A. (N. S.) 202.]

■ Tested by these rules, we think the trial court erred in submitting the case to the jury on the ground of mental incapacity. The

.fact that he .did not speak to his sister, Mrs. Ilennings and her husband several days before the will was executed, in itself,. is no evidence that he did not have mental capacity to execute the will on September 7, 1938; nor was the fact that the receipt he signed for witness Wright had to be repeatedly read to him any, such evidence. The fact that hospital records show that he threatened the hospital orderly. with a knife on September 4th is, in itself, no evidence that he did not have sufficient mental capacity on the date the will was executed for the reason the medical testimony in this case shows that a person would become normal in about a day after the bladder was drained. But assuming that this evidence was sufficient to show he was not in his right mind on that date, we have just stated that that in itself is of no probative value unless it raises a reasonable inference. as to his mental condition at the time the will was signed. [Whitacre v. Kelly, supra.] And the evidence showed that this condition would practically clear up in a day.

We have already detailed the evidence bearing on this question and will not discuss the testimony of each witness, but we are convinced that after a careful study of this evidence the case should not have been submitted to the jury on the issue of mental capacity.

Respondents have filed in this Court an additional abstract of the record showing a photostatic copy of the will. The abstract of the record shows a photostatic copy of an instrument admitted to be testator's signature. Respondents contend that the jury had a right to compare these signatures to see if the signature on the will was genuine, and that, therefore, the verdict should be sustained. In other words, the jury had a right to pass on the question of whether the will was a forgery.

The question of forgery was not raised by respondents' petition. In fact, the petition tacitly admits the execution of the will.

In the case of Palm v. Maguire, 347 Mo. 189, 146 S. W. (2d) 636, 1. c. 637, we said:

"The issue of due execution was not made by the pleadings. The petition did not allege that the will was not formally executed. It asked that the will be set aside for two reasons only, to-wit, mental unsoundness and undue influence. We realize that in a will contest, even though improper execution is not alleged in the petition, the proponents are required to make proof of due execution to the satisfaction of the court. [Fletcher v. Henderson, 333 Mo. 349, 1. c. 356, 62 S. W. (2d) 849.] Here such proof was made and it was not contradicted. .

"Above the signatures of the attesting witnesses appears the usual attestation clause which reads:

"'Signed, published and declared by the above named Roscoe. P. Jennings, as and for his last Will and Testament, in our presence, who at his request and in his presence and in the presence of each other

836

have hereunto subscribed our names as witnesses thereto on the last date above mentioned.'

"Such a properly executed attestation clause has been held to furnish prima facie proof of all facts essential to due execution, 28 R. C. L., p. 369, sec. 370. [See, also, German Evangelical Church v. Reith, 327 Mo. 1098, l. c. 1109, 39 S. W. (2d) 1057, 76 A. L. R. 604.]

"Beside that, the petition in the instant case is very similar to the pleading considered in Heinbach v. Heinbach, 274 Mo. 301, 202 S. W. 1123, wherein we held that such a pleading constitutes an admission of ·due execution."

The trial court instructed the jury that the only question for them to decide was testator's mental capacity. There was no issue of forgery made in this case.

The judgment is therefore reversed and the cause remanded to the trial court, with directions to permit proponents of the will to prove the will in solemn form. It is so ordered. All concur.