John W. HODGES, D.L. Hodges, and Joseph Hodges, Plaintiffs-Respondents,

v.

Mucie B. HODGES,
Defendant-Appellant,

and

Gladys Johnson, Defendant.

No. 13879.

Missouri Court of Appeals,
Southern District,
Division Three.

June 3, 1985.

David E. Blanton, Sikeston, for defendant-appellant.

Michael O'N. Barron, St. Louis, for plaintiffs-respondents.

CROW, Presiding Judge.

This is an action under § 473.083, Laws 1980, pp. 456–57, contesting the will of R.L. "Rube" Hodges, who died April 23, 1982, at age 90 or 91. The contestants (plaintiffs below) are Rube's three sons: Daughtery Lee "Dort" Hodges, John W. "Jake" Hodges and Joseph Franklin "Joe" Hodges, born, respectively, in 1919, 1921 and 1923. The contestants' mother, Rube's first wife, was Lucy Edith Hodges, who married Rube in 1913 and died July 23, 1977, still wed to him. Rube and Edith, in addition to their three sons, had a fourth child, Dorothy. From the meager evidence about Dorothy, we glean that she predeceased Rube and Edith and left no offspring.

The will was executed June 27, 1979. The proponent of the will is Mucie B. Hodges, who married Rube July 19, 1978, not quite a year after Edith's death. Mucie, as best we can determine, was about 71[1] when she married Rube. Mucie remained Rube's wife until he died. The will devises Rube's entire estate to Mucie, except for bequests of $10 each to Dort, Jake, Joe, and a niece of Rube's, Gladys R. Johnson.[2]

1. As we understand Mucie's testimony, she was 77 when the cause was tried, May 2–3, 1984.

2. Gladys' father and Rube were brothers. Under an earlier will of Rube's, executed April 2, 1977 (while Rube's first wife, Edith, was still alive), Gladys would have evidently received a substantial bequest. Gladys did not, however, join Dort, Jake and Joe in contesting Rube's 1979 will. Consequently, the three contestants made Gladys a defendant along with Mucie. In the record before us, there is no indication that Gladys filed a responsive pleading to the contestants' petition. There was, however, an entry of appearance filed in the trial court on April 28, 1983, by attorney David E. Blanton in which said attorney entered the appearance of his firm "for and on behalf of the defendants in this said

The will was admitted to probate May 12, 1982, by the Probate Division of the Circuit Court of Mississippi County. This suit was filed September 9, 1982.[3]

The contestants assailed the will on the grounds that (1) it "was not properly executed," (2) Rube lacked "testamentary capacity" when he signed it, and (3) Rube signed it under the undue influence of Mucie.

A jury trial resulted in a verdict that the will, hereafter referred to as "the document," was not Rube's last will and testament. Judgment was entered per the verdict. Mucie appeals.[4]

Mucie briefs two assignments of error, both of which attack rulings by the trial court on certain motions filed by Mucie during and after the trial. Those motions, three in number, are hereafter described.

The first motion came at the close of all the evidence. Mucie moved the court to direct a verdict that the document was Rube's last will and testament. The motion was denied. The trial court submitted the issues of (a) proper execution and (b) testamentary capacity to the jury by Instruction 8.[5] The trial court submitted the issue of undue influence to the jury by Instruction 9.[6] The trial court, in other instructions, defined "sound and disposing mind and memory" (MAI 15.01 [1969 New]) and "undue influence" (MAI 15.03 [1969 New]). The trial court also instructed the jury on the burden of proof (MAI 3.03 [1981 Revision]).

The jury, as we have seen, returned a verdict in favor of the contestants and against Mucie.

After judgment was entered on the verdict, Mucie moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. Both of those motions were denied.

The thrust of Mucie's motion for a directed verdict at the close of all the evidence was that the evidence showed that Rube executed the document in compliance with Missouri law governing execution of wills, that the evidence further showed that at the time Rube executed it, he was of sound and disposing mind and memory, and that the contestants did not present sufficient evidence to submit the issue of undue influence to the jury.

cause." At trial a year later, the docket sheet shows that Mucie Hodges and Gladys Johnson were both represented by attorney Blanton. Gladys, however, was called as a witness by the contestants and, consequently, was cross-examined by attorney Blanton. In this court, on his brief, attorney Blanton identifies himself as counsel for "Defendants-Appellants." The notice of appeal, however, identifies Mucie, alone, as the appellant. Therefore, irrespective of Gladys' posture in the trial court—whatever it was—Gladys is not a participant in the appeal. See *Ballwin Plaza Corp. v. H.B. Deal Construction Co.,* 462 S.W.2d 687, 688[1] (Mo.1971); *Moore v. City of Pacific,* 534 S.W.2d 486, 493–94[3] (Mo.App.1976).

3. The filing of a timely petition stating a cause of action to contest a will has the effect of vacating the judgment of the probate division admitting the disputed will to probate, leaving the will unproven unless and until established by the judgment of the circuit court. *Fletcher v. Ringo,* 164 S.W.2d 904, 906[4] (Mo.1942); *Smith v. Smith,* 327 Mo. 632, 37 S.W.2d 902, 904[7] (1931); *Danforth v. Danforth,* 663 S.W.2d 288, 293[1] (Mo.App.1983). *See,* however, § 473.-083.9, Laws 1983, pp. 858–59, pertaining to dismissal of such actions.

4. Footnote 2, *supra.*

5. Instruction 8 (MAI 31.06 [1978 Revision]) read:
   "Your verdict must be that the document in issue is the last will and testament of R.L. Hodges if you believe:
   First, the document was signed by R.L. Hodges and declared by him to be his last will and testament, and
   Second, that at the time of signing, R.L. Hodges was of sound and disposing mind and memory, and
   Third, that the document was attested by at least two competent witnesses, signing their names to the document in his presence and at his request,
   unless you believe the document in issue is not the last will and testament of R.L. Hodges by reason of Instruction Number 9."

6. Instruction 9 (MAI 32.18 [1969 New]) read:
   "Your verdict must be that the document in issue is not the last will and testament of R.L. Hodges if you believe that R.L. Hodges signed the document as a result of the undue influence of Mucie B. Hodges."

The thrust of Mucie's motion for judgment notwithstanding the verdict was that the uncontradicted evidence showed that Rube executed the document in compliance with Missouri law governing execution of wills, that there was no evidence that Rube lacked testamentary capacity when he executed it, and that there was no evidence to support a jury submission on the issue of undue influence.

Mucie's motion for new trial, so far as it pertains to this appeal, incorporated the grounds of the two other motions.

Mucie's first assignment of error on appeal is that the trial court erred in denying the aforesaid motions in that, according to Mucie, she made a prima facie case of due execution and the contestants failed to present "substantial evidence of improper execution, and particularly lack of testamentary capacity, so as to justify submission of the issue of execution to the jury." That submission, as noted earlier, was made by Instruction 8.

Mucie's second assignment of error is that the trial court erred in denying the aforesaid motions in that the contestants failed to present sufficient evidence of undue influence to justify submission of that issue to the jury. That issue, as we have seen, was submitted by Instruction 9.

In considering Mucie's assignments of error, it is necessary to acknowledge certain relevant precepts.

A court is ordinarily not justified in directing a verdict in favor of the party having the burden of proof when the evidence relied on consists of oral testimony. *Price v. Bangert Brothers Road Builders, Inc.*, 490 S.W.2d 53, 57[5] (Mo.1973); *Schaefer v. Accardi*, 315 S.W.2d 230, 233 (Mo.1958); *Maurath v. Sickles*, 586 S.W.2d 723, 728[4] (Mo.App.1979). In a will contest, the proponents have the burden of establishing a prima facie case as to due execution, *Fletcher*, 164 S.W.2d at 906[5]; *Maurath*, 586 S.W.2d at 728[5], and a prima facie case as to testamentary capacity, *Houghton v. Jones*, 418 S.W.2d 32, 39[3] (Mo.1967); *Maurath*, 586 S.W.2d at 728[5].

However, once the proponents have done so, the contestants, to make a case for a jury on the issue of due execution, are required to adduce some substantial evidence that the will was not properly executed, *Fletcher v. Henderson*, 333 Mo. 349, 62 S.W.2d 849, 851[3] (1933); *Maurath*, 586 S.W.2d at 728[5], and to make a case for a jury on the issue of testamentary capacity, the contestants are required to adduce some substantial evidence that the testator did not have the mental capacity to make a will, *Houghton*, 418 S.W.2d at 39[4]; *Fletcher*, 62 S.W.2d at 851[3]; *Maurath*, 586 S.W.2d at 728[5]. Where the proponents make a prima facie case of due execution and testamentary capacity, and the contestants fail to adduce substantial contradictory evidence on either, such issues should not be submitted to the jury, and it is reversible error to do so over the proponents' objection. *Maurath*, 586 S.W.2d at 728[5]; *Pasternak v. Mashak*, 392 S.W.2d 631, 640[14–16] (Mo.App.1965).

Cases in which a trial court directed a verdict for the proponents of a will at the conclusion of all the evidence and the ruling was upheld on appeal include *Lewis v. McCullough*, 413 S.W.2d 499 (Mo.1967); *DeLaney v. Coy*, 407 S.W.2d 902 (Mo.1966); *Aaron v. Degnan*, 272 S.W.2d 216 (Mo.1954); *Wright v. Stevens*, 246 S.W.2d 817 (Mo.1952); *Winn v. Matthews*, 235 Mo.App. 337, 137 S.W.2d 632 (1940). Cases in which it was held on appeal that it was error to submit to the jury the issue of testamentary capacity because, after the proponents had made a prima facie case, the contestants did not present substantial evidence to support their challenge include *Glover v. Bruce*, 265 S.W.2d 346 (Mo.1954); *Nute v. Fry*, 341 Mo. 1138, 111 S.W.2d 84 (1937); *Pasternak*, 392 S.W.2d 631.

Undue influence is treated differently. The burden of proving undue influence rests upon the contestants. *Martin v. O'Connor*, 406 S.W.2d 41, 43[5] (Mo.1966); *McCormack v. Berking*, 365 Mo. 913, 290 S.W.2d 145, 150[3] (1956). By "undue influence" is meant "such influence as destroys the free choice of the person making

the will," MAI 15.03 [1969 New], and to meet this test the exerted influence must be of sufficient strength to destroy the free agency of the testator at the time of the making of the will, so that the will is not in fact the testator's own will but that of the party exercising the influence. *Sweeney v. Eaton,* 486 S.W.2d 453, 455 (Mo.1972); *State ex rel. Smith v. Hughes,* 356 Mo. 1, 200 S.W.2d 360, 363[4] (banc 1947); *Beckmann v. Beckmann,* 331 Mo. 133, 52 S.W.2d 818, 823 (1932).

■ A presumption arises that the testator has been unduly influenced by the beneficiary so charged when the evidence shows: (1) that a confidential or fiduciary relationship existed between the testator and the beneficiary, (2) that the beneficiary has been given a substantial bequest by the will, and (3) that the beneficiary was active in procuring the execution of the will. *Simmons v. Inman,* 471 S.W.2d 203, 206[1] (Mo.1971); *Switzer v. Switzer,* 373 S.W.2d 930, 940–41[21] (Mo.1964); *Carroll v. Knott,* 637 S.W.2d 368, 370[2] (Mo.App. 1982); *Cockrum v. Cockrum,* 550 S.W.2d 202, 208[13] (Mo.App.1977). When supported by substantial evidence, the presumption makes a prima facie case which does not disappear upon the introduction of rebutting testimony but presents an issue for the jury. *Loehr v. Starke,* 332 Mo. 131, 56 S.W.2d 772, 776[3] (banc 1932); *Carroll,* 637 S.W.2d at 370[2]; *Maurath,* 586 S.W.2d at 730[10]; *Pasternak,* 392 S.W.2d at 636[4].

Mindful of the foregoing rules, we turn to the evidence.

Rube and his first wife, Edith, were natives of southeast Missouri. Although they lived in St. Louis for a time after their marriage, they returned to Mississippi County with their children in 1930, and Rube bought 80 acres near Anniston. Rube and Edith farmed that tract and other land, and eventually moved into a house on the 80 acres in 1943. Rube continued to farm until about 1975. When he ceased farming, Rube rented the land to others, but he and Edith continued to live in the house.

As Dort, Jake and Joe reached adulthood, they left home. Dort settled in Michigan, where he remained. Jake stayed in Mississippi County, earning his livelihood selling automobiles. Joe established residence in St. Louis. All three, however, maintained contact with their parents. Dort made at least one visit a year. Jake saw his parents frequently, sometimes more than once a week. Joe came down from St. Louis nearly every weekend.

In December, 1977, five months after Edith's death, Rube sold the farm, but evidently not the site where the house stood, as he continued to live there, alone. Rube discussed the sale with Jake, who quoted Rube as saying: "Land is at a good price now. You boys ain't interested in farming. Joe and Dort is one place and you're here. The money would do you more good than the farm."

The sale price, as best we can determine, was to be paid to Rube in annual installments over 20 years. Rube negotiated the terms and the interest rate. Jake conceded that at this point in Rube's life, Rube was still able to handle his business affairs.

Jake explained that Rube was represented in the farm sale by attorney John R. Hopkins, Jr., who, 8 months earlier, had prepared a will for Rube [7] and, some time before that, had represented Rube in a probate court proceeding to have a guardian appointed for Edith.

Mucie testified that she had known Rube and Edith since about 1943. At the time of Edith's death, Mucie, a childless divorcee who had been single since 1951, was living in a home of her own at East Prairie. According to Mucie, Rube, after Edith's death, would "drop by and see how I was" when Rube was in East Prairie.

On April 3, 1978, Rube, while driving his automobile south of Charleston, was involved in a collision which "totaled" the car. Rube was taken to a Sikeston hospital by ambulance and was treated there by

---

**7.** Footnote 2, *supra.*

John H. Askew, a medical doctor. Askew described Rube's injuries as a laceration of the scalp and forehead in the left temporal area, a laceration of the left hand, and a laceration of the left knee. Rube was admitted to the hospital "for observation" and was discharged April 5, 1978, "to resume pre-hospital activities."

Mucie testified that when Rube was released from the hospital, she and Wiltoma Davis (Edith's sister) took Rube to his home by automobile. According to Mucie, she was promptly employed by Wiltoma and Rube's son Joe as a "housekeeper" to take care of Rube. Mucie thereupon moved into Rube's home. Mucie explained that Wiltoma also stayed there, sharing a room with Mucie.

Joe denied involvement in arranging for Mucie to stay with Rube.

Bernice Hash of Eldon, Missouri, a sister of Rube, visited Rube about a month after the accident. Bernice, who was not previously acquainted with Mucie, testified that during the visit, Mucie asked her to encourage Rube to marry her. Bernice testified she told Mucie, "He's old enough to know what he wants."

Bernice mentioned the matter to Rube later, asking whether he planned to marry. Bernice quoted Rube as saying, "No, I am too old for that."

The following day, however, Bernice and her husband took Rube and Mucie to East Prairie. While there, Mucie, according to Bernice, said, "Why don't we go in here and pick up the rings." Bernice testified that Rube and Mucie entered a store and Mucie selected some rings, for which Rube paid. Nothing else was said about a marriage, and Bernice and her husband returned to their home a few days later.

Mucie denied asking Bernice to persuade Rube to marry her. According to Mucie, the marriage was Rube's idea. Rube asked Jake to be the "best man," but Jake refused. Jake testified he declined because Rube did not wait a year after Edith's death before marrying Mucie. None of Rube's sons attended the wedding al-

though, according to Mucie, all were invited.

The document that spawned this litigation was executed not quite a year after the marriage. Mucie testified that one day Rube came in the house from outside and said: "I want you to do something for me. I've decided I am going to have a will wrote. Call the employees where Mr. Joslyn used to be." "Mr. Joslyn" was evidently L.D. Joslyn, a Charleston attorney who died in 1979.

Mucie explained that she made the call, speaking first to a lady and then to "Mr. Vaughan." An appointment was scheduled.

Jeffrey Clay Vaughan, a Charleston attorney, testified he had been associated with L.D. Joslyn in the practice of law until Joslyn's death. Vaughan, who was previously unacquainted with Rube or Mucie, testified that Rube and Mucie came to his office and that Rube said he wanted to make a will. The date of this conference was established by Cheryl Morris, a secretary in Vaughan's office, as Monday, June 25, 1979. Cheryl was acquainted with Rube, he being her husband's "great-uncle."

According to Vaughan, Rube stated he "wanted to leave his property to his wife, with the exception of $10 each to his children and a niece." Asked how he learned the identity of the children and the niece, Vaughan replied, "He told me who they were and I took their names down to get the spellings the best I could." Vaughan remembered Rube's asking if Vaughan could serve as executor. Vaughan advised Rube that was permissible if Rube so desired.

Vaughan recalled no comments or questions by Mucie during the conference.

Vaughan prepared the document, and on Wednesday, June 27, 1979, Rube and Mucie returned to Vaughan's office. Vaughan testified that after they were seated, he (Vaughan) "took out the will that I had prepared, handed him a copy of it, and then I read the will to him as I had prepared it

according to his instructions." Asked whether Rube looked at the document, Vaughan stated: "Well, he took it in his hand and appeared to be looking at it while I read it. Of course, I was looking down while I was reading and was not watching him." Asked whether he read the document in a normal tone of voice, Vaughan responded: "I read it probably somewhat louder, but probably in a normal tone of voice. I read it so he could hear me." Then, said Vaughan: "I first asked him, after I had read the will, to acknowledge whether that's what he wanted. He indicated it was, so I called out to the front office and told the secretary to bring in another witness for the purpose of witnessing his signature on the will."

Cheryl Morris and Hazel Williams, an abstracter whose office was nearby, then entered the room where Vaughan, Rube and Mucie were seated. Vaughan testified he asked Rube: "Is this your last will and testament and do you want these people to witness it for you?" Rube, according to Vaughan, said "Yes," or "Yes, it is." Vaughan qualified this, stating: "My specific recollection is he at least nodded, and I believe he spoke. He spoke when the witnesses were in there."

Then, said Vaughan, Rube signed the document, and Cheryl and Ms. Williams signed as witnesses. Vaughan added that he had no difficulty communicating with Rube during either of the two conferences.

Cheryl recalled that Rube "nodded" when asked by Vaughan whether the document was his last will and testament. Cheryl watched as Rube signed. Cheryl then signed and watched as Ms. Williams signed. Cheryl observed nothing on either of Rube's visits to Vaughan's office indicating that Rube was unaware of what he was doing. Cheryl did, however, remember that Vaughan, during his first conference with Rube, talked "loud because he had to."

Mucie testified that she made no suggestions to Vaughan or Rube about the document and that she did not know what Rube intended to do with his property until she heard him tell Vaughan.

Mucie recalled that on the second visit to Vaughan's office, Rube had a copy of the document in front of him while Vaughan read it aloud. According to Mucie, Rube, with the aid of his glasses, was able to read. Mucie explained that after Vaughan read the document, Rube stated "that's the way he wanted it." Mucie testified that the witnesses were then called in and that Rube and the witnesses signed the document.

■ The testimony of Vaughan, Cheryl Morris and Mucie regarding the execution of the document was more than sufficient to make a prima facie case of execution in compliance with § 474.320, RSMo 1978.[8]

■ The request by a testator to the witnesses to attest his will, and the publication of the will by the testator, need not be made by express words, but may be by acts, signs or conduct and may be inferred from the circumstances. *Strahl v. Turner*, 310 S.W.2d 833, 839–40[9] (Mo.1958). It is necessary only that the parties understand that the testator intends the document to be his last will, that he expects the witnesses to sign it as such, and that he and the witnesses sign it in the presence of each other under circumstances showing that they all understand the purpose and effect of the document. *Heinbach v. Heinbach*, 274 Mo. 301, 202 S.W. 1123, 1128[10] (1918). If the testator, either by words, acts, signs or conduct makes it clear to the witnesses that he intends the paper signed to be his will, there is publication, *Lohmann v. Lohmann*, 216 S.W. 518[2] (Mo.1919), and although it is a general rule that the testator or someone acting for him in his presence must request the subscribing witnesses to attest the document, such request, as noted above, need not be oral and may be inferred from the circumstances surrounding

---

**8.** Section 474.320, RSMo 1978, provides: "Every will shall be in writing, signed by the testator, or by some person, by his direction, in his presence; and shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator."

the signing. *Look v. French*, 346 Mo. 972, 144 S.W.2d 128, 133[15] (1940). Consequently, even if Rube, when asked by Vaughan in the presence of Cheryl Morris and Hazel Williams whether the document was his last will and testament and whether he wanted Cheryl and Hazel to witness it for him, merely nodded his assent instead of saying "Yes," or "Yes, it is," such response, in light of the other evidence regarding the execution of the document, was sufficient.

Having decided that a prima facie case of due execution was made, we next examine the evidence to see whether there was a prima facie case that Rube, on June 27, 1979, had the mental capacity to make a will.

A testator with mind enough to understand the ordinary affairs of life, the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will in the manner therein stated is capable of making a will under the law of Missouri. *Strahl*, 310 S.W.2d at 838[7]; *Hardy v. Barbour*, 304 S.W.2d 21, 34[5] (Mo.1957); *Rex v. Masonic Home of Missouri*, 341 Mo. 589, 108 S.W.2d 72, 84[4] (1937).

There was, as we have seen, testimony by Vaughan that Rube, two days before he signed the document, told Vaughan the disposition he wanted to make of his property and named his three sons and his niece, Gladys Johnson. Additionally, Rube, according to Vaughan, asked whether Vaughan could serve as executor.

Dr. Askew, who treated Rube for the injuries he received in the April 3, 1978, auto accident, became Rube's physician thereafter for the final four years of Rube's life. According to Dr. Askew, Rube's ailments included congestive heart failure, pulmonary edema and prostate hypertrophy. Dr. Askew testified that although Rube wore a hearing aid, Rube was able to understand what he was told. Dr. Askew's testimony included this:

"Q Were you able to communicate with him?

A Yes.

Q When you would talk with him and work with him, did he have the comprehension and understanding of what you were telling him?

A Yes.

Q Did he always agree with what you told him and what you wanted him to do?

A No.

Q Was he a man that, from your observation of him, would be easily persuaded or influenced in doing anything?

A I don't think that anybody who knew him would say that you could influence Rube very easily, Mr. Hodges; he was fairly hard-headed."

Lottie Cox, who saw Rube and Mucie frequently after their marriage, testified that Rube never had any difficulty hearing what she (Lottie) said. According to Lottie, Rube was a man who could make up his own mind about things. Lottie never observed Rube "to be addled or mentally disturbed or unable to make up his mind about anything."

Mucie testified that Rube, with the aid of his eyeglasses, was able to read when he signed the document in Vaughan's office. She explained that she and Rube had a joint bank account, that he signed some of the checks, and that he could make up his own mind and tend to his own business. Mucie added that although Rube had a hearing problem, he could, by use of his hearing aid, engage in conversation with others, in person and by telephone.

After the marriage, Rube prepared plans for an additional bedroom for Mucie's house at East Prairie. In October, 1981, Rube contacted a building contractor, Larry Colson, and arranged for the addition to be built. The bedroom, together with other improvements, amounted to about $3,400. The contractor, Colson, had no difficulty understanding what Rube wanted. Colson's father, who had known Rube for 20 years, testified Rube said he wanted Mucie to be comfortable the rest of her life because she had made him comfortable.

In 1981, Rube underwent prostate surgery. Eva Jones, a private nurse who looked after Rube at the hospital and thereafter at his home, testified he was responsive in conversation and "had a very sharp mind." A notation by the urologist who treated Rube at that time states Rube "was mentally completely clear."

Jack Farmer, cashier of a Charleston bank where Rube did business, testified that during the last five or six years of Rube's life, Rube had no difficulty transacting business or explaining what he wanted done.

James F. Smith, who farmed Rube's land the last few years before Rube sold it, testified he visited Rube several times a year "up through 1979." According to Smith, Rube was responsive in conversation and seemed to be alert and in full control of his mental faculties.

The testimony of Vaughan, Cheryl Morris, Dr. Askew, Lottie Cox, Eva Jones, Jack Farmer, James F. Smith, Mucie, and Larry Colson and his father, together with the urologist's record, obviously made a prima facie case that Rube was mentally capable of making a will when he executed the document in issue. Having held earlier that a prima facie case of due execution was also made, we now turn to the contestants' evidence to see whether it was sufficient to make a jury issue as to either due execution or testamentary capacity.

R.F. Guerra, a licensed optometrist, testified he examined Rube March 15, 1978, and September 11, 1979, and that Rube, at the times of those examinations, would have been unable to read the document in issue.

John R. Hopkins, Jr., the attorney who prepared the will Rube executed April 2, 1977,[9] testified that Rube was "quite deaf at that time," and that in order to make oneself understood, "a person would have to probably repeat in a rather loud voice what you wanted him to hear." Hopkins explained that Rube was sued over the automobile accident of April 3, 1978, and that he (Hopkins) represented Rube in that

suit. Hopkins attended the taking of a deposition from Rube in connection therewith. Rube's son Jake, who arranged for Hopkins to represent Rube in that suit, also attended the deposition, the date of which, according to Jake, was July 13, 1979 (16 days after Rube executed the document in issue).

Hopkins testified, in substance, that the lawyers questioning Rube during the deposition had a "communication problem" because of Rube's "extreme deafness." Hopkins explained that many questions had to be repeated and that all inquiries "had to be in as loud a voice as you could comfortably manage." Jake, according to Hopkins, helped communicate with Rube. Hopkins' testimony, however, included this:

"Q Do you recollect now whether Mr. Hodges had any difficulty in remembering various aspects of the accident?

A The best I could say, his memory was adequate to remember the facts."

And this:

"Q ... But when you got through to him and he understood the question, were his responses in order and like he knew what he was talking about?

A I would say so, yes."

Rube's sister, Bernice Hash (mentioned earlier), testified that Rube began having trouble with his eyesight and hearing before Edith died, and that these conditions grew worse after Edith died. Bernice recalled she was visiting Rube after his marriage to Mucie and Rube stated: "I can't read. My eyes are in bad shape. I can't see to write my name." According to Bernice, Rube spent his days sitting in his chair.

Bernice testified she saw Rube about three weeks before he died, and during that visit he said: "I feel terrible. I ain't going to be here much longer, but there is one thing I would like to have got done. I would like to fix it so she [indicating Mucie] would be taken care of." Asked whether Rube was capable of handling ordinary affairs of life, Bernice stated Rube's mind

9. Footnote 2, *supra*.

was "okay" but his physical problems were "bad." In Bernice's words: "His mind was all right, but his physical condition was not."

Gladys Ruth Johnson [10] testified that after Edith's death, she saw Rube several times a month. According to Gladys, Rube's activities after marrying Mucie were limited to sitting in his chair, eating meals and occasionally going outside and playing with his dogs. Gladys explained that Rube had "very poor hearing" and that after his auto accident she never saw him read. Gladys conceded, however, that Rube had "a pretty good memory" after his marriage to Mucie.

Gladys recalled a conversation with Rube within a month of his death in which he stated: "Gladys, I want you to know I appreciate everything you have done for us. You will get well paid for this. I want you to know you are on my will." Gladys added that in her opinion, Rube, after the auto accident and his marriage to Mucie, could not "take care of the ordinary affairs of life."

Rube's eldest son, Dort, recalled an occasion when he was with Rube and Mucie before their marriage and Rube asked Dort to count some money because he could not. Dort added that after Edith's death, Rube did not read newspapers or watch television. Dort explained that Rube's hearing was bad before the auto accident and got worse thereafter. At that stage of Rube's life, his activities, said Dort, were eating meals, sitting, walking around the house and being taken for automobile rides.

Dort opined that Rube, after the auto accident, could not handle anything "that put any tension on him at all" and was not capable of writing a check or engaging in business activity. Dort conceded, however, that Rube's memory was still "pretty good," and that when Rube sold the farm, Rube's mental condition was "good."

Dort's wife, Edna Marie, testified that after Rube's auto accident, his vision was "very impaired and he did not read."

Rube's hearing, according to Edna Marie, was "very limited." She corroborated Dort's description of Rube's daily activities and expressed the belief that after the accident, Rube could not "take care of the ordinary affairs of his life."

Rube's youngest son, Joe, testified that Rube stopped reading after Edith's death even though Rube's eyesight remained "very good." Joe explained that after Edith's death, he (Joe) would visit Rube every weekend and "open the bills and tell him what it was all about." According to Joe, Rube had no trouble understanding what the bills were for.

Joe related that during the first year of Rube's marriage to Mucie, Rube would cut the grass and "didn't know when to stop." This worried Joe because Rube would get hot, and Joe feared Rube would have a heart attack. Joe observed Rube spill things while eating "because his coordination was very bad." Joe also described a "nerve condition" that caused Rube to move his tongue back and forth.

Joe supplied an insight unmentioned by the other witnesses:

"Q During this time, Mr. Hodges, was your father a man who asserted himself and ordered other people around and generally was a dominant kind of a person?

A Definitely; uncontrollable temper, and I hate to say it, but downright mean disposition.

Q When was he this kind of a person?

A All his life; all his life."

Rube, according to Joe, never had the patience to handle ordinary household and business affairs. Joe explained that while Edith was alive, she took care of such details. Asked whether he saw any signs that Rube was losing his memory near the time of his death, Joe answered, "Not really."

Jake, Rube's middle son, testified that Rube's hearing started getting bad about 1956 and that Rube bought his first hear-

10. Footnote 2, *supra.*

ing aid and a pair of eyeglasses around that time. According to Jake, Rube's hearing and eyesight got worse after the auto accident. In Jake's words: "He could not read nothing." Asked whether he had to raise his voice in talking to Rube, Jake replied, "I sat right down on the stool in front of his chair and he had to be looking at me." Jake confirmed attorney Hopkins' account of the communication difficulties with Rube during the 1979 deposition and, contrary to Hopkins, Jake testified Rube "couldn't remember much about that accident."

Jake expressed the opinion that Rube, after the accident and his marriage to Mucie, could not handle the ordinary affairs of his life. Jake testified that Rube, while hospitalized shortly before his death, was aware he did not have long to live. Jake recalled this conversation:

> "I said, 'Well, it's getting closer.' And he said, 'You know I have a will,' which I said, 'Yes,' which I did know; but I didn't mention no name or anything, now. And he said, 'Do you know where it is?' And I said, 'Nope.' And he said, 'Well, John Hopkins has got it.'"

Jake disavowed any knowledge of the document in issue prior to Rube's death, explaining that he (Jake) was unaware that Rube knew attorney Vaughan or that Rube had ever done business with Vaughan.

■ Extreme old age, with its attendant physical and intellectual weaknesses, does not, of itself, incapacitate the testator from making a will and raises no presumption of his not having a disposing mind, if he is able to transact his ordinary business and is capable of understanding the extent of his property and appreciates the natural objects of his bounty. *Hennings v. Hallar*, 347 Mo. 827, 149 S.W.2d 338, 341–42[4] (1941); *Nute*, 111 S.W.2d at 87. The mere fact that a testator has an imperfect memory, is forgetful of names of persons, or requires repetition of questions, is not evidence of such mental disease that will render him incapable of making a will. *Hennings*, 149 S.W.2d at 341–42[5]; *Loehr*, 56 S.W.2d at 775. Old age, physical weak-

ness, infirmity and disease may be shown, however, to aid the jury in determining whether the testator had sufficient testamentary capacity at the time of making his will. *Minturn v. Conception Abbey*, 227 Mo.App. 1179, 61 S.W.2d 352, 358[1] (1933).

■ The contestants' evidence in the instant case, viewed in the light most favorable to them, failed, in our opinion, to make a submissible case for the jury on either the issue of due execution of the document or the issue of Rube's testamentary capacity. Contestants' evidence did show, of course, that Rube, when he signed the document on June 27, 1979, had failing eyesight and poor hearing. There was, however, no substantial evidence that Rube lacked testamentary capacity as heretofore defined.

Attorney Hopkins conceded that when Rube's deposition was taken in the accident suit (16 days after the document was executed), Rube adequately recalled the facts of the accident and knew what he was talking about. Rube's deafness was, in Hopkins' view, apparently no impediment to making a will, as Hopkins, who drew Rube's 1977 will, testified that Rube was "quite deaf" at the time that will was executed.

Bernice Hash conceded that while Rube's physical problems were serious, his mind was "all right," and Gladys Johnson and Dort Hodges acknowledged that Rube's memory remained "pretty good" after his marriage to Mucie. Joe Hodges likewise saw no sign that Rube was losing his memory.

We are aware, of course, that Gladys Johnson, Dort Hodges, Edna Marie Hodges and Jake Hodges testified, in varying contexts, that Rube, in his last years, was unable to take care of the ordinary affairs of his life. That testimony, however, fairly read, does not, in our view, attribute such inability to any mental defect or incapacity, but rather to infirmities of age, namely failing eyesight, poor hearing and sedentariness, and to Rube's aversion to routine details. Joe Hodges' handling of Rube's

household bills after Edith died was no departure from custom, as Joe testified that because of Rube's disdain for such tasks, Edith had taken care of them during her lifetime.

We have not overlooked the testimony of Bernice Hash that Rube, shortly before his death, expressed regret that he had failed to arrange things to take care of Mucie, nor have we ignored the testimony of Gladys Johnson that Rube, around the same time, told her that she was on his will. We are likewise cognizant of Jake's testimony that Rube, when his death was imminent, said that John Hopkins had his will.

■ That testimony, while undeniably supportive of an inference that Rube's mind was muddled at the time he allegedly made such statements, does not, in our opinion, constitute substantial evidence that he lacked testamentary capacity 3 years earlier when he signed the document in issue. Rube, when he allegedly made these statements, was in the final month of his life and apparently in the throes of his last illness. Such statements, considering the circumstances in which they were made, are hardly indicative of Rube's mental capacity 3 years earlier.

We find only two other statements attributed to Rube about the 1977 Hopkins will. Jake testified Rube mentioned that will to him in May, 1978. That, of course, would have been 13 months before Rube signed the document in issue here, so that statement could nowise indicate that Rube did not understand the document in issue or that he forgot about it after signing it. Joe recalled that Rube mentioned making a will with "Mr. Banta" (Hopkins' law partner), but Joe did not recall when Rube said this. Joe admitted, however, that he saw little of Rube during the last year of Rube's life, and nothing in Joe's testimony establishes that Rube made the statement after he executed the document in issue.

That contestants recognize the paucity of their evidence on the issues of due execution and testamentary capacity is manifest from their brief, in which they build their argument on those issues around the contention that because of Rube's failing eyesight and poor hearing, the jury could infer that Rube was unable to read the document in issue and did not hear and understand Vaughan when Vaughan read the document aloud before Rube signed it. Nowhere do we find an argument by contestants that Rube, at the time he signed the document, lacked the mental capacity to understand the ordinary affairs of life or the nature and extent of his property, or to know the persons who were the natural objects of his bounty. Instead, contestants seize upon Rube's comments to Bernice Hash, Gladys Johnson and Jake during Rube's final illness, which are admittedly inconsistent with the document in issue, as evidence that Rube, at the time he signed it (3 years earlier), was prevented by his failing eyesight and poor hearing from understanding that it left all his property to Mucie and disinherited his three sons and Gladys Johnson.

Contestants' argument, while commendably ingenious, is unavailing. To accept contestants' thesis, one would have to assume that Vaughan, who had never met Rube or Mucie prior to June 25, 1979, either conceived independently the disposition of Rube's property contained in the document in issue, or that Vaughan, in the conference of June 25, 1979, misunderstood Rube's testamentary instructions. Such speculation is destitute of evidentiary support. Vaughan testified that Rube not only explained how he wanted to dispose of his property, but also identified his sons and Gladys Johnson, and asked whether Vaughan could serve as executor.

Additionally, Cheryl Morris recalled that after Vaughan's first conference with Rube, Vaughan, in giving her directions for typing the document in issue, handed her an "old will" of Rube's which Vaughan used in dictating the document. That "old will," of course, could not have been in Vaughan's possession prior to June 25, 1979. Whether that "old will" was the 1977 will prepared by Hopkins or some other will is unimportant; the fact that it

was turned over to Vaughan is evidence that Rube understood he was changing the testamentary disposition of his property. Contestants' argument that the evidence supports an inference that Rube, because of his physical infirmities, did not comprehend the effect of the document when he signed it, is untenable.

Inasmuch as Mucie made a prima facie case of due execution and testamentary capacity, and the contestants failed to present substantial evidence that the document was not properly executed or that Rube lacked testamentary capacity at the time he executed it, those issues should not have been submitted to the jury. *Maurath*, 586 S.W.2d at 728[5]; *Pasternak*, 392 S.W.2d at 640[14–16]. Mucie's objection to the submission of those issues was registered by her motion for a directed verdict at the close of all the evidence, which asserted, in pertinent part, that the evidence showed Rube executed the document in compliance with Missouri law governing execution of wills and that at the time he executed it, he was of sound and disposing mind and memory.

We do not convict the trial court of error in failing to grant Mucie's motion for directed verdict, however, because, as shall appear hereafter, we find the evidence sufficient to make a submissible issue on the question of undue influence. What we hold is simply that the issues of due execution and testamentary capacity should not have been submitted to the jury, and that the jury's role should have been confined to resolving the question of undue influence.

We note, in passing, that Instruction 8,[11] which submitted the issues of due execution and testamentary capacity, was tendered by Mucie, not the contestants. That fact, however, does not, in the circumstances shown by this record, foreclose Mucie from complaining.

The rule that a party cannot complain on appeal of error committed or invited by him applies to instructions, but the better view is that a party is not estopped by the rule of invited error unless it appears from the record that the court was led or induced by him to commit the error. *Myers v. Buchanan*, 333 S.W.2d 18, 23[5] (Mo. banc 1960).

Here, Mucie did not induce the trial court to submit the issues of due execution and testamentary capacity to the jury, nor did Mucie induce the court to give an instruction which erroneously declared the law or which was in conflict with the evidence. Instruction 8 faithfully tracks MAI 31.06 [1978 Revision], approved by the Supreme Court of Missouri as the verdict directing instruction on the issues of due execution and testamentary capacity, and there was, as we have noted, abundant evidence on the affirmative side of both issues. The error in giving Instruction 8 was simply that there was insufficient evidence on the negative side of either issue to make a jury question.

The Committee's Comment under MAI 31.06 [1978 Revision], citing *Gordon v. Burris*, 153 Mo. 223, 54 S.W. 546, 550–51 (1899), explains that the burden is on the proponent of a will to establish that the instrument was executed and signed by the testator as and for his last will, that the signatures of the attesting witnesses were placed on such instrument in the testator's presence and at his request or with his consent, and that at the time the testator executed the instrument he was of sound and disposing mind and memory. The Comment further explains, however, that such issues need not be submitted to the jury unless the contestants offer proof to the contrary. In support of this admonition, the Comment cites the following rule from *Fletcher*, 62 S.W.2d at 851:

"It was therefore incumbent upon the proponents of the will in the first instance to make proof of the due execution of the will, i.e., compliance with all the requirements and formalities prescribed by statute, and that the testator was at the time of sound mind. When this was done 'the weight of the evidence

---

**11.** Footnote 5, *supra.*

was against the contestant' and it then 'became necessary,' in order for contestants 'to obtain a submission' to the jury of either, that the instrument was not duly executed or testamentary incapacity, as an issue, 'to adduce some substantial evidence tending to support' such affirmation 'in total default of which' the trial judge could properly direct a finding on such issue in favor of proponents."

Mucie, when the trial court decided to submit all issues to the jury, found herself in a position where it was in her interest to ensure that the elements of due execution and testamentary capacity (on which she was required to make a prima facie case, and did) were submitted by a correct instruction, so that if she won the verdict it would be immune from attack for instructional error. Given that situation, we decline to hold that Mucie, by supplying Instruction 8, induced the trial court to erroneously submit the issues of due execution and testamentary capacity to the jury. *Compare, Pasternak*, 392 S.W.2d at 637–40. Accordingly, we hold that Mucie is not barred from complaining on appeal—as she does in her first point—that the contestants' evidence did not justify submission of those issues.

We turn now to Mucie's second point, in which she insists that the contestants failed to present sufficient evidence to support a jury submission on the issue whether Rube executed the document as a result of undue influence by Mucie. Implicit in Mucie's position is the concession that the law recognizes that a wife may, in some circumstances, be guilty of such undue influence as to invalidate her husband's will. It has been so stated in *Hammonds v. Hammonds*, 297 S.W.2d 391, 394 (Mo.1957).

■ In determining whether contestants made a submissible case on undue influence, we accept their evidence as true and disregard Mucie's evidence except as it aids contestants, and we afford contestants all favorable inferences which reasonably may be drawn from the whole evidence. But we consider contestants' evidence in its entirety and isolated parts thereof only in their proper relation to the whole of contestants' evidence. *Snell v. Seek*, 363 Mo. 225, 250 S.W.2d 336, 337[1] (1952); *Walter v. Alt*, 348 Mo. 53, 152 S.W.2d 135, 142 (1941).

The three elements that give rise to a presumption that the testator has been unduly influenced by the beneficiary have been noted earlier: a confidential or fiduciary relationship between the testator and the beneficiary, a substantial bequest to the beneficiary, and an active role by the beneficiary in procuring execution of the will.

There was, obviously, a substantial bequest to Mucie. The document leaves her all of Rube's estate except four $10 bequests. We must therefore determine whether there was sufficient evidence to support a finding of each of the other two elements.

■ As to whether there was a confidential or fiduciary relationship between Rube and Mucie, we note it has been said that a proper and usual husband and wife relationship in and of itself denotes mutual confidence, and, in one sense, each spouse is in a "fiduciary" relationship to the other. It is necessarily something beyond this relationship, however, which must exist as between husband and wife before it may be said that either is the fiduciary of the other within the meaning of the "fiduciary" or "confidential" relationship necessary to be established as a basis for an inference or a presumption of undue influence. *Snell*, 250 S.W.2d at 342.

Bernice Hash testified Mucie said that she had to take care of all of Rube's business.

Mucie testified that she and Rube had a joint bank account and that Rube's payments from the sale of his farm were deposited therein. Additionally, prior to their marriage, Rube had turned over some $14,-000 or $15,000 of his money to Joe which, according to Joe, was to be used by Joe to buy some property in Mississippi County. Joe explained that after Rube married Mucie, she phoned him (Joe) and asked him to

return the money. Joe met Mucie at a bank and signed a check returning the funds. Although the details are unclear, Mucie concedes that the funds ended up in her and Rube's joint account. Joe testified he mentioned the matter later to Rube and that it was apparent from Rube's reaction that he was unaware the money had been returned. Additionally, Joe revealed, as earlier noted, that Rube relied on others to handle financial details of his home and farm. Edith took care of them while she was alive and Joe handled them after Edith's death until Joe ceased his weekly visits about a year before Rube died. Joe explained that in addition to going over routine bills with Rube, he (Joe) told Rube about his insurance and Medicare coverage.

Mucie conceded that as between her and Rube, she was the one who took care of paying the bills.

Gladys Johnson described an incident when two police officers came to Rube's home and Rube walked to their car. Gladys recalled Rube saying: "I cannot hear you. I will have to call my wife." Gladys, at Rube's request, summoned Mucie, who came outside. Gladys then departed.

■ The terms "confidential" and "fiduciary" are, in general application, synonymous. *Wilhoit v. Fite*, 341 S.W.2d 806, 813 (Mo.1960). A confidential relationship exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other; the question in such case is always whether or not trust is reposed. *Id.* at [6]; *Selle v. Wrigley*, 233 Mo.App. 43, 116 S.W.2d 217, 221[4] (1938).

*Wilhoit*, 341 S.W.2d at 813–14, in holding the evidence there sufficient to support a finding that a confidential relationship existed between the testatrix and the beneficiary, emphasized the following factors: (1) the testatrix had great faith and confidence in the beneficiary, (2) they each, to a certain extent, used money kept in a common fund, (3) they had a joint safety deposit box, (4) the beneficiary collected certain rentals and made bank deposits for the testatrix, (5) the beneficiary assisted the testatrix in checking her books and accounts in order to assemble her income tax figures, and (6) the beneficiary looked after the testatrix' business "pretty much."

Similar characteristics are present in the instant case. While we recognize that it is customary for married couples to maintain joint bank accounts and to discuss and decide financial and business matters jointly, we find evidence here of more than that. The jury could reasonably find that Rube had relied, in turn, on Edith, Joe and Mucie to handle many, if not most, of his financial affairs. The jury could also reasonably find that this reliance increased with Rube's advancing age, as his dislike of such matters intensified and his eyesight and hearing grew weaker. Particularly significant is Joe's testimony that Mucie handled Joe's return of the $14,000–15,000 and that Rube was apparently unaware of it. Rube's call for Mucie when confronted by the police officers is further evidence that he relied on her.

■ Recognizing that the evidence of a confidential relationship between Rube and Mucie is not overwhelming, and that the jury could have easily found that no such relationship existed, we are nonetheless persuaded that there was enough evidence, viewed most favorably to contestants, to support an affirmative finding on that issue.

As to whether Mucie was active in procuring execution of the document, it was established by her testimony that she was the one who made the phone call to arrange the appointment for Rube to see Vaughan. Although Mucie testified Rube was the one who chose the Joslyn law office, the jury was not required to believe that. *Thayer v. Sommer*, 356 S.W.2d 72, 77[6] (Mo.1962). In that regard, Mucie, contrary to her trial testimony, testified on deposition, 15 months before trial, that she just picked Vaughan out of the phone book.

The evidence supports a finding that Mucie was aware, at the time the appointment

was made with Vaughan, that attorney Hopkins was representing Rube in the auto accident suit. Jake testified he arranged for Hopkins to handle that litigation, and the jury could reasonably infer that Mucie selected Vaughan to prepare the document because of fear that if Hopkins were employed for that task, Hopkins would inform Jake. Such an inference is strengthened by the absence of evidence that any of the contestants were aware that Vaughan had prepared the document, or that Rube, by that document, was leaving each of them only $10.

Moreover, there was evidence that Mucie made misstatements about certain aspects of Rube's testamentary plan. Edna Marie Hodges quoted Mucie as saying, a year and a half before Rube's death, that Edna's husband, Dort, was the executor of Rube's will. Additionally, Gladys Johnson testified that Mucie told her a number of times that she (Gladys) was on Rube's will and would be well paid for things she had done for Rube. The jury could infer from this evidence that Mucie had procured the execution of the document and was attempting to prevent Rube's kin from discovering that he had executed it.

■ While certainly not compelling, the evidence was nevertheless, in our opinion, sufficient to support a finding that Mucie was active in procuring the execution of the document in issue.

■ There was, consequently, sufficient evidence to support all three elements necessary for a presumption of undue influence. Moreover, there was evidence of undue influence apart from that presumption. We make this observation because it has been held that a finding of undue influence does not absolutely depend upon establishment of the three-element presumption, but can be based on other facts and circumstances if they are sufficient to permit a reasonable inference of undue influence. *McCormack*, 290 S.W.2d at 150–51[6]; *Matthews v. Turner*, 581 S.W.2d 466, 472[3] (Mo.App.1979).

Bernice Hash testified she overheard Mucie talking on the phone to a niece in California and that Mucie said: "Honey, you don't have to worry. I have got everything in my name. I have taken care of that a long time ago. You don't have to worry." Bernice also recalled Mucie saying, on one occasion, that she (Mucie) "was going to see that the boys didn't get anything."

Gladys Johnson recalled Mucie stating, during a period when Rube was hospitalized, that she "was going to see that Jake didn't get anything." Gladys also recalled overhearing Mucie tell someone on the phone: "Don't worry about it. Everything is fixed. Everything is in my name. Don't worry about it, honey."

Edna Marie Hodges testified Mucie told her that Rube "was leaving Jake with nothing."

Joe Hodges testified that Mucie was always trying to turn him against Jake and was constantly running Jake down.

■ Evidence of hostile feelings of a beneficiary toward an expected recipient of a testator's bounty is relevant in determining whether undue influence has been exercised, *Carroll*, 637 S.W.2d at 370–71[3]; *Matthews*, 581 S.W.2d at 472, and the jury could have inferred the exercise of undue influence from Mucie's comments that she had taken care of getting everything in her name.

That Mucie had the ability to influence Rube could be inferred from the incident described by Bernice Hash in which Rube professed that he was too old for marriage, yet the next day, at the instance of Mucie, Rube purchased rings she selected.

Whether the evidence apart from the three-element presumption would have been sufficient for a jury submission on undue influence is a matter we need not decide. We mention such evidence merely to show that the evidence of undue influence was not confined solely to the presumption.

■ We are aware, of course, that a wife may justly and properly influence the making of a will by her husband for her

benefit, so long as the influence is not exercised in an improper manner or by improper means, or so long as the influence is not sufficient to have, in effect, substituted the will of the wife for that of the husband, resulting in the prevention of the exercise of independent judgment by him. *Snell,* 250 S.W.2d at 342[7]. While Rube may have executed the document free of compulsion by Mucie, we cannot so declare as a matter of law. The evidence of undue influence adduced by the contestants was sufficient to support a jury submission on that issue. Mucie's second point is, accordingly, denied.

Inasmuch as we have held that the trial court erred in submitting the issues of due execution and testamentary capacity to the jury, the judgment must be reversed and the cause must be remanded for a new trial. *Pasternak,* 392 S.W.2d 631. If contestants' evidence at retrial on the issues of due execution and testamentary capacity is no more substantial than before, those issues should not be submitted to the jury. If contestants at retrial are able to make substantially the same case or a better one on the issue of undue influence, that issue should again be submitted to the jury.[12] *Cf., Turner v. Anderson,* 236 Mo. 523, 139 S.W. 180, 186[8] (1911).

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

PREWITT, C.J., and TITUS, FLANIGAN and MAUS, JJ., concur.

---

12. Although the question is not before us and we do not decide it, it would appear that if the issue of undue influence, alone, is submitted, Instruction 8 (footnote 5, *supra* ) could properly be modified to read as follows:

"Your verdict must be that the document in issue is the last will and testament of R.L. Hodges unless you believe it is not his last will and testament by reason of Instruction Number 9."

If Instruction 8 be given in substantially the above form, there would be no need to give MAI 15.01 [1969 New], nor the *first paragraph* of MAI 3.03 [1981 Revision].