**Lena RHOADES and Kermit Hodges, Personal Representative of the Estate of Florence Hodges, deceased, Respondents,**

v.

**Lorene CHAMBERS, individually and as alleged Executor of the alleged Will of Vivian Hodges, Appellant.**

No. 15437.

Missouri Court of Appeals, Southern District, Division One.

Oct. 26, 1988.

400

John E. Price, Woolsey, Fisher, Whiteaker & McDonald, Springfield, and Richard T. Martin, Gainesville, for appellant.

Michael J. Patton, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, and

Grant Q. Haden, Wade and Haden, Ava, for respondents.

CROW, Presiding Judge.

On February 21, 1986, Vivian B. Hodges, a spinster who, as best we can determine from the record, was about 64 years of age, executed a two-page document purporting to be her last will and testament. Vivian died two weeks later on March 7, 1986. On March 24, 1986, the document was presented to the Probate Division of the Circuit Court of Douglas County, and admitted to probate.

On June 20, 1986, this action was commenced per § 473.083, RSMo 1986, contesting the validity of the purported will. A two-day jury trial produced a verdict that the document was not Vivian's last will and testament. Judgment was accordingly entered; this appeal followed.

The proponent of the purported will—appellant here—is Lorene Chambers, executrix and sole legatee. Contestants are (a) Lena Rhoades, and (b) Kermit Hodges, Personal Representative of the Estate of Florence Hodges, deceased.

Lena Rhoades is Vivian's mother, and is also the mother of the now-deceased Florence Hodges, who survived Vivian by about a year. Vivian and Florence were the only children ever born to Lena.

Lorene Chambers' father, as we comprehend the testimony, was a brother of Lena Rhoades, making Lorene a niece of Lena and a cousin of Vivian and Florence.

Florence, evidently a spinster like Vivian, suffered a broken hip in 1966 and was bedfast thereafter until her death in 1987. Florence resided with her mother, Lena, near Ava, Missouri. Lena took care of Florence, assisted by others.

Vivian, during her adult life, was employed in various locales in Missouri, her final employment being at Western Electric in the Kansas City area. Vivian retired from that employment in September, 1983, departed Kansas City, and moved into a "trailer" across the road from the residence of Lena and Florence. From then until her final illness Vivian, assisted by others, took care of Lena and Florence.

Before synopsizing the evidence pertinent to the issues we must decide, it is helpful to set forth Lorene's two assignments of error. The first avers the trial court erred in giving instructions 8 and 4.

Instruction 8 (MAI 31.06 [1978 Revision]) stated:

"Your verdict must be that the document in issue is the last will and testament of Vivian Hodges if you believe:

First, the document was signed by Vivian Hodges and declared by her to be her last will and testament, and

Second, that at the time of signing, Vivian Hodges was of sound and disposing mind and memory, and

Third, that the document was attested by at least two witnesses, signing their names to the document in her presence and at her request.

unless you believe the document in issue is not the last will and testament of Vivian Hodges by reason of Instruction Number 9."

Instruction 4 defined the phrase "sound and disposing mind and memory." [1]

Instructions 8 and 4 submitted to the jury the issues of (1) due execution of the purported will, and (2) Vivian's testamentary capacity to make a will. Lorene maintains her evidence made a prima facie case of due execution and a prima facie case of testamentary capacity, and that the contestants—respondents here—failed to adduce any substantial evidence that the will was not properly executed or that Vivian lacked the requisite mental capacity to make a will. Consequently, says Lorene, the issues framed by instructions 8 and 4

---

1. Instruction 4 (MAI 15.01 [1969 New]) stated: "The phrase 'sound and disposing mind and memory' as used in these instructions means that when a person signed her will she: First, was able to understand the ordinary affairs of life; and Second, was able to understand the nature and extent of her property; and Third, was able to know the persons who were the natural objects of her bounty; and Fourth, could intelligently weigh and appreciate her natural obligations to those persons."

should not have been submitted to the jury, and the trial court committed reversible error in doing so.

■■■ The rules pertinent to Lorene's first point are recited in *Hodges v. Hodges*, 692 S.W.2d 361 (Mo.App.1985), supported by ample citation of authority. In a will contest the proponent has the burden of establishing (1) a prima facie case as to due execution, and (2) a prima facie case as to testamentary capacity. *Id.* at 366[3]. Once the proponent has done so, the contestant, to make a case for a jury on the issue of due execution, is required to adduce some substantial evidence that the will was not properly executed, and to make a case for a jury on the issue of testamentary capacity the contestant is required to adduce some substantial evidence that the testator did not have the mental capacity to make a will. *Id.* Where the proponent makes a prima facie case of due execution and a prima facie case of testamentary capacity, and the contestant fails to adduce substantial contradictory evidence on either issue, such issues should not be submitted to the jury, and it is reversible error to do so over the proponent's objection. *Id.* at 366[4].

Before further discussion of Lorene's first point we turn to her second. Regarding it, we note that the trial court also gave instructions 9 and 5. Instruction 9 (MAI 32.18 [1969 New]) stated:

> "Your verdict must be that the document in issue is not the last will and testament of Vivian Hodges if you believe that Vivian Hodges signed the document as a result of the undue influence of Lorene Chambers."

Instruction 5 (MAI 15.03 [1969 New]) stated:

> "The phrase 'undue influence' as used in these instructions means such influence as destroys the free choice of the person making the will."

■■■ Lorene's second point avers the trial court erred in overruling Lorene's motion for a directed verdict at the close of all the evidence in that the respondents "failed to make a submissible case of undue influence." The rules pertinent to Lorene's second point are also recited in *Hodges*, 692 S.W.2d 361. The burden of proving undue influence rests upon the contestant. *Id.* at 366[5]. To meet the test articulated in instruction 5, quoted above, the exerted influence must be of sufficient strength to destroy the free agency of the testator at the time of the making of the will, so that the will is not in fact the testator's own will but that of the party exercising the influence. *Id.* at 366–67[6]. A presumption arises that the testator has been unduly influenced by the beneficiary so charged when the evidence shows: (1) a confidential or fiduciary relationship existed between the testator and the beneficiary, (2) the beneficiary has been given a substantial bequest by the will, and (3) the beneficiary was active in procuring the execution of the will. *Id.* at 367[7]. When supported by substantial evidence the presumption makes a prima facie case which does not disappear upon the introduction of rebutting testimony but presents an issue for the jury. *Id.*

Summed up, Lorene's position is that (a) her evidence made a prima facie case that Vivian properly executed the purported will and a prima facie case that Vivian had the mental capacity to do so, and respondents failed to present sufficient contrary evidence to require submission of either issue to the jury, and (b) respondents failed to make a submissible case that Vivian executed the purported will as a result of undue influence by Lorene. Consequently, maintains Lorene, at the conclusion of all the evidence the trial court should have directed a verdict that the purported will was Vivian's last will and testament.

■■■ We shall decide Lorene's second point before ruling her first. In determining whether respondents made a submissible case on the issue of undue influence we accept their evidence as true and disregard Lorene's evidence except as it aids respondents, and we afford respondents all favorable inferences which reasonably may be drawn from the whole evidence. *Hodges*, 692 S.W.2d at 376[21]. However, we consider respondents' evidence in its entirety and isolated parts thereof only in their

proper relation to the whole of their evidence. *Id.*

So viewed, the evidence established that Vivian, for some 20 years prior to her death, had manifested a desire to provide for the care and support of her mother, Lena, and invalid sister, Florence. Sherry Johnson, who had known Vivian since 1951, testified that as far back as 1966 Vivian's "main concern was that she would be able to work long enough in Kansas City to save enough money to take care of her mother and sister." Sherry explained: "They had been home-bound for as long as I've ever knew them. And Florence was an invalid, and [Vivian] didn't know how things would go in the future. And she just wanted to make sure that, financially, they'd be taken care of in their old age." Sherry, who assisted Vivian in moving from Kansas City to the trailer near her mother's home, was asked whether Vivian disclosed her purpose for the move. Sherry replied, "She was moving down to take care of her mother and her sister."

Sherry's sister, Mary Leschinsky, also a longtime friend of Vivian, recalled that Vivian's concern "was always that her mother and sister be taken care of by her." Mary quoted Vivian as saying she had worked "all these years," and was saving money because she was afraid it would be up to her to care for Florence if her mother died.

Delma Swain, who helped Lena take care of Florence "for the last 20–some years," testified that in 1980 Vivian inquired whether she (Delma) could take care of Lena and Florence for three more years so Vivian could retire. Vivian told Delma several times that she (Vivian) wanted her mother and sister "to have everything." Delma recalled Vivian saying on several occasions that she hardly knew Lorene, the last such instance being shortly before Christmas, 1985.

Mildred Stickrod, a cousin of Lena, recalled a conversation with Vivian about a year before Vivian retired. According to Mildred, Vivian was eager "to get that year over so she could come home and be with her mother."

Bill Stevick, a management official at Western Electric, became acquainted with Vivian in 1967 or 1968. Vivian told Stevick about Lena and Florence. In 1983 Vivian conferred with Stevick about whether she needed a will. Stevick recalled that Vivian's assets included a mobile home and the lot on which it sat, an automobile, some certificates of deposit, some bonds, and "her group life insurance with the company." According to Stevick, Vivian had put her property in her name and her mother's name "as a joint tenant." Stevick added that Vivian wanted to be sure her mother was "on her insurance." Vivian's intent, said Stevick, was that her mother and sister inherit her property. Stevick had no recollection of Vivian ever mentioning Lorene.

Nina Huff recounted a conversation with Vivian in the fall of 1985 during which Vivian was asked whether she had her affairs "fixed up to where the Court wouldn't get everything." Nina quoted Vivian as saying she did not have to worry about that, as she "already had it fixed up."

Mildred Gott, a cousin of Vivian who resided with Vivian during the 1940's and 1950's, testified: "Vivian's main concern was for her mother ... she was very devoted to her. She wanted her mother to have what she—what she left. And she wanted to provide and make it easier for her mother because her mother had had a very rough life." Asked whether Vivian ever mentioned Lorene, Mildred replied that Vivian would say, "I do not know Lorene."

Vivian became ill in early January, 1986, and entered Springfield General Hospital about January 13.

Sherry Johnson testified that on January 21, 1986, she saw Lorene at a musical program and Lorene said Vivian "was in real bad health." Lorene asked Sherry if she knew how Vivian "had her finances set," and whether Lena's name was on any of Vivian's assets. Sherry replied that as far as she knew, Vivian had Lena's name on everything Vivian had, "including her trailer, her stocks and bonds, her checking and savings accounts." Lorene, according to

Sherry, asked about the aggregate value of Vivian's assets. Sherry expressed a belief that Vivian was worth at least $40,000. Sherry recalled Lorene saying that Lena had never loved Vivian, that Lena was mean to Vivian when Vivian was a child, and that Lena "was just a hateful old woman." Sherry also recalled Lorene saying she would assure Vivian "that she would just loan her her mother to give her all the love she needed."

Nina Huff testified that on Thursday, January 23, 1986, she went with Lorene and Lorene's mother, Alta Moore, to the hospital to visit Vivian. According to Nina, Lorene told Vivian, "Well, Vivian, honey, since you don't have a mother that loves you, I'm going to loan you my mother to love you." Then, said Nina, Alta Moore hugged and kissed Vivian and told her she loved her. Lorene then put her arm around Vivian and told her she loved her.

Vivian was released from Springfield General Hospital January 26, 1986, and returned to her residence. Delma Swain testified that Lorene's mother, Alta Moore, thereupon moved in with Vivian. Delma asked Lorene what Alta was doing, and Lorene replied, "I've just got her here to take care of Vivian." Delma recalled seeing Lorene getting Vivian's "papers" together for preparation of Vivian's income tax returns. Delma also remembered a few instances when Lorene attempted to persuade Lena to sign some papers to get her name "off of things," but Lena refused. Additionally, said Delma, there were nurses who came to Vivian's trailer to take care of Vivian. Vivian liked them, but Lorene dismissed them.

During the last two and a half years of Vivian's life Nan Mothes, an employee of the Douglas County Health Department, went to Lena's home three days a week to help care for Florence. Nan never saw Lorene at Vivian's or Lena's residence until January, 1986. Nan testified she talked with Vivian the morning after Vivian returned from the hospital, and that Vivian had worked out a schedule whereby there would be someone coming in every day to help her. Lorene, however, said her moth-er was going to stay with Vivian and that she (Lorene) was going to tell the other individuals not to come. Nan recalled Lorene spending a day looking through Vivian's "tax papers" and talking with Vivian about them. At that time, according to Nan, Vivian was "very weak." Nan also described an incident in which Lorene attempted to persuade Lena to sign a paper whereby Lena's name would be removed from Vivian's savings and checking accounts. Lena refused and Lorene departed, saying, "There's other ways of getting this done." Nan quoted Lorene as saying Lena didn't care for Vivian, but only for Florence, and that she (Lorene) had told Vivian she would share her mother with her. Nan also quoted Lorene as saying, "[I]f Lena knew that Vivian had all that money, she would have probably had it already spent."

Mildred Stickrod visited Vivian after Vivian came home from the hospital. Vivian reported to Mildred that Lorene had told Vivian the doctor had said she (Vivian) was not going to live. Vivian disclosed to Mildred that she (Vivian) "had everything made out to her mother, that she wanted her mother to get what she had ... her mother had had a hard life." Mildred quoted Vivian as saying that Lorene had told her Lena did not care for her. Vivian asked Mildred if she thought it was so. Mildred replied she did not, that Mildred knew Lena loved Vivian.

Earlene Evans, who had known Vivian and Lorene over 30 years, testified that Lorene visited her (Earlene) after Vivian came home from the hospital. Earlene quoted Lorene as saying Vivian was very sick and that if something happened to her and her money went to Lena or Florence their "Welfare checks" would be stopped. Earlene replied that Vivian's assets should go to Lena and Florence, and that after they spent the money they could "get their checks back." Asked how Lorene responded, Earlene said: "She turned red in the face and bugged her eyes out. And I seen that I had said the wrong thing."

Fay Humbyrd visited Lena and Vivian frequently after Vivian moved back from

Kansas City in 1983. The first time Fay saw Lorene with Vivian was after Vivian had been discharged from the hospital. Fay testified she received a phone call from Lorene during which Lorene professed worry about Lena's name being on Vivian's assets. Fay quoted Lorene as saying Vivian needed a will. Fay urged Lorene to "pull back."

About two weeks after Vivian's release from the hospital her condition became worse, so on February 10, 1986, per the advice of her doctor, she was taken by ambulance to Cox South hospital in Springfield. There she was treated for "respiratory failure and chronic obstructive pulmonary disease with emphysema."

James F. Abbott, Jr., a hospital chaplain, visited Vivian regularly. Abbott testified, "She would talk about her mother, about her sister, how she loved them, how she was concerned about them and wanted to be sure that they were taken care of after she left." Abbott recalled one visit during which Lorene was present and Abbott was asked what would have to be done to give Lorene power to sign checks for Vivian to pay Vivian's bills. Abbott suggested that Vivian talk with her attorney about that.

While Vivian was hospitalized at Cox South, James E. Curry, an Ava lawyer, received a phone call from Dallas Chambers, Lorene's husband of 36 years. While Curry did not testify as to the date of the call, Lorene's testimony indicated it was the day after Vivian was taken to Cox South. Dallas informed Curry that Vivian wanted Curry to prepare her a will. Curry, who was unacquainted with either Dallas or Vivian, went to the hospital and discussed the subject with Vivian. Curry recalled that Lorene was present, along with a lady in a wheelchair who was introduced to him as Lena Rhoades. Curry testified Vivian stated she wanted her property to go to Lorene. Curry added, however, that Vivian expressed concern for her mother and her sister, both invalids, and it was his impression that Vivian wanted Lorene to have her (Vivian's) property so that Lorene could use it to look after Vivian's mother and sister. Curry recalled that when Vivi-

an stated she wanted her property to go to Lorene, Lorene said, "No, I would rather you didn't do that," and left the room. Vivian and Curry also discussed a power of attorney that would authorize Lorene to handle Vivian's business. Curry concluded from what Vivian told him that she trusted Lorene.

Curry prepared a will and a power of attorney for Vivian at his office. The will provided, in pertinent part:

"II.

I declare that I am single and have no children, and at the date of the execution of this will my closest relatives are my mother and my sister who I direct shall take nothing from my estate.

III.

The rest, residue, and remainder of my estate I give, devise and bequeath to Lorene Chambers.

IV.

I appoint Lorene Chambers as personal representative of my estate.... I further direct that no bond be required of my personal representative."

An unspecified number of days after his conference with Vivian, Curry returned to the hospital, carrying the will and the power of attorney. Curry discussed the will with Vivian, in the presence of Reverend Abbott. Curry recalled that the three of them were the only persons present on this occasion. Abbott's recollection was different, as appears *infra*.

According to Curry, he read the will to Vivian, after which she "apparently wanted to think about it further and didn't execute it that day." Curry remembered advising Vivian that if she wanted more time to think about it, she should have it. Curry instructed Reverend Abbott as to how the will should be executed should Vivian decide to do so. Curry then departed, taking the unexecuted will with him. He may have left a copy with Vivian, but he was uncertain.

Reverend Abbott confirmed he was present when Curry presented the will to Vivian. Additionally, said Abbott, Lorene, Lorene's husband (Dallas), and a woman later introduced to Abbott as Lorene's mother were also present. On that occasion, said Abbott, Vivian had some doubts and concerns about the will because her mother and sister were not beneficiaries. Abbott testified: "[Vivian] asked Lorene at least once, perhaps twice or more—I cannot remember—'Now, you will use this money to take care of mom and my sister?' Lorene gave her that assurance. She still seemed to have some doubt. So, at that time, her attorney said, 'Well, why don't we wait for a moment—for a while, and you can decide, you know, if this is the way you want it, or if you want me to change it. And as soon as you've made up your mind, you can let me know, and we can go on and—and have this done.' "

A few days later, on February 21, 1986, Dallas Chambers picked up the unexecuted will at Curry's office and took it to Cox South hospital, where he advised Reverend Abbott that Vivian was ready to sign it.

Abbott testified he took the document to Vivian's room where he talked with her privately. According to Abbott, he asked Vivian repeatedly whether she understood that her mother and her sister were not beneficiaries. Abbott quoted Vivian as saying, "Yes, I know, but Lorene has promised me that she would use all the money she receives to take care of my mother and my sister and not for her own benefit."

Having satisfied himself, Abbott summoned a nurse, Marcy Ann Estes, so that she and he could serve as attesting witnesses. According to Abbott, those present at the execution of the will, in addition to himself, nurse Estes and Vivian, were Lorene, Dallas Chambers, and Lorene's mother. Abbott recalled that before Vivian signed the will she elicited assurances from Lorene that she (Lorene) would care for Vivian's mother and sister.

Vivian then signed the will, and Abbott and nurse Estes signed as witnesses. Everyone except Vivian then left the room. At that point, said Abbott: "Lorene started talking to both Marcy and me, saying that she realized that when we got out that she was the only beneficiary; that people would think that she had used unduly [sic] influence and so on and so forth, and that the only concern she had was for Vivian and for Vivian's mother and for Vivian's sister."

Nurse Estes testified that during the days preceding execution of the will she would see Vivian "probably every hour during the day." Asked what treatment Vivian was receiving, Estes replied, "She received oxygen therapy, I.V. therapy, medications by mouth, respiratory therapy." Estes described Vivian's condition as weak. Estes, like Reverend Abbott, recalled that Lorene and Dallas Chambers were present when Vivian signed the will. Estes did not, however, remember Lorene's mother being there. According to Estes, there was no discussion between Vivian and Lorene before the signing. Estes confirmed, however, that after the group left Vivian's room Lorene "made a point of saying that she would see that [Vivian's] mother got taken care of."

At trial, Lorene denied being present when Curry presented the will to Vivian, and Lorene also denied any discussion with Vivian about using Vivian's assets to take care of Lena and Florence. Lorene avowed she was not present when Vivian signed the will, explaining that she (Lorene) arrived at the hospital just after the signing. Lorene denied any statements to Reverend Abbott or nurse Estes about seeing that Vivian's money would be used to take care of Lena and Florence. According to Lorene, she first saw Vivian's will on her (Lorene's) dining room table when she arrived home the afternoon of February 21, 1986. Lorene insisted she did not read the will, but she conceded she put it in "the safety deposit box" where it remained until after Vivian's death.

Before summarizing the evidence regarding the final two weeks of Vivian's life we turn briefly to the evidence about her finances.

An employee of the Douglas County National Bank testified that on October 3,

1983, Vivian established a passbook savings account and a checking account in the names "Vivian B. Hodges or Lena Rhoades." That same day Vivian purchased a certificate of deposit, titling it the same way.

On an unspecified date prior to February 18, 1986, Lorene appeared at the bank and asked about her name being put on the accounts. She was advised that the bank required written authorization from Vivian.

On February 18, 1986, three days before the will was signed, Lorene brought the bank written authorization from Vivian for the addition of Lorene's name to the passbook savings account and the checking account. The bank added Lorene's name to both accounts that date. Lorene inquired of the bank about removing Lena's name from the passbook savings account and was told the bank needed authorization from Vivian stating she wanted the account closed and reopened in different names. The bank prepared the necessary document and gave it to Lorene.

On February 19, 1986, Lorene returned to the bank with the document bearing Vivian's signature. It authorized the bank to close the passbook savings account and reopen it in the names "Vivian B. Hodges or Lorene Chambers." The bank changed the account accordingly.

On February 22, 1986 (the day after Vivian signed her purported will), Lorene brought the bank a power of attorney signed by Vivian—inferably a duplicate original of the power of attorney prepared by attorney Curry. The power of attorney authorized Lorene "to do transactions on all of the accounts that Vivian had." The bank retained the power of attorney.

Exercising the authority conferred by the power of attorney, Lorene closed the checking account (to which her name had been added only four days earlier) and deposited the funds in a new checking account in the names "Vivian B. Hodges or Lorene Chambers." Inasmuch as Lorene, alone, signed the signature card for the new checking account, only she could write checks on it. Two days later, on February 24, 1986, Lorene added her name to the

certificate of deposit pursuant to the power of attorney.

At trial, the bank employee was asked whether Lorene ever explained why she was taking Lena's name off Vivian's accounts. The bank employee replied: "At one time, I remember that Lorene told us something about that Lena had—was trying to either get supplemental income or something of this sort. I did not get the full view of exactly what she was trying to get. This was supposed to have been, maybe, jeopardizing—her name on the accounts might jeopardize her getting this money."

On March 5, 1986, two days before Vivian's death, Lorene returned to the bank, and utilizing the power of attorney, closed the passbook savings account and placed the funds from it in a "money market plus account" in the names "Vivian B. Hodges or Lorene Chambers." That same day Lorene also cashed in 108 "Series E Bonds" in the names "Vivian Hodges and Lena Rhoades," depositing the proceeds thereof in the new "money market plus account." None of the bonds had matured. Lorene, alone, signed the signature card for the new account.

Also on March 5, 1986, Lorene closed the checking account and transferred the funds to a "Super Now account" in the names "Vivian B. Hodges or Lorene Chambers." Lorene, alone, signed the signature card. Additionally on March 5, Lorene cashed in the certificate of deposit, to which she had added her name nine days earlier. Lorene used the funds from that certificate (which had not yet matured), together with funds from the newly opened Super Now account, to purchase two new certificates of deposit, each in the amount of $5,000, in the names "Vivian B. Hodges or Lorene Chambers." Lorene, alone, signed the signature card for the two new certificates.

While the events at the bank had been unfolding, Vivian, on February 23, 1986, had been transferred from Cox South hospital to a nursing home in Springfield. Delma Swain testified she visited Vivian there and that Vivian liked her roommate. Delma recalled the nursing home was "aw-

ful dingy" and "there wasn't any light." There were evidently heavy curtains separating Vivian's area from her roommate's. Delma suggested that Vivian pull the curtains back so she could see her roommate. According to Delma, Vivian replied: "Oh, no. Lorene told me not to." Sherry Johnson, who accompanied Delma on the visit, had a similar recollection of the incident. Sherry fixed the date as March 1, 1986.

There was evidence of other relevant events, but the dates they occurred cannot be ascertained from the testimony. Sherry Johnson recalled she once asked Lorene about Vivian's condition and Lorene stated Vivian was so ill she was unable to talk to anyone.

Mary Leschinsky testified she once phoned Vivian's room at the hospital and Lorene answered. Mary asked to speak to Vivian; Lorene replied Vivian was unable to talk.

Nan Mothes testified she, Fay Humbyrd, and Lena were taken to the hospital one morning by Fay's husband, Reverend Ira Humbyrd, to visit Vivian. Soon after their arrival Lorene and her mother came in, accompanied by another visitor. After some 15 to 20 minutes, Fay suggested that the group retire to the hall so Vivian and Lena could have time to talk alone. At that point, according to Nan, Lorene's mother immediately sat down and Lorene pretended she had not heard the suggestion. Later Nan renewed the suggestion, but it was ignored by Lorene.

Fay Humbyrd described the same visit as Nan Mothes. Fay recalled Vivian saying, "Would everybody please leave the room, so I can spend the day with momma?" Fay quoted Lorene as replying: "I'm not about to. I'm staying here."

Mildred Gott testified she once phoned the hospital and Lorene answered. Mildred asked to talk to Vivian. Lorene said, "No, Vivian has had a bad night." Mildred then asked, "Well, could I come, or is there anything I could do?" Lorene answered, "No."

Vivian died at the nursing home.

Mary Leschinsky testified she saw Lorene at the funeral home and Lorene "kept telling me how much that Lena did not love Vivian and how awful she was to Vivian, and that Lena had never cared for Vivian." Mary did not believe Lorene. Mary testified: "Any time Lena talked about Vivian, it was with love and respect because she would tell us what Vivian had done for her. Maybe she had just called her again or maybe sent something to her or brought something or bought her something that— that she needed."

On March 24, 1986, 17 days after Vivian's death, Lorene delivered Vivian's purported will to attorney Curry, who presented it for probate. Curry's charge for preparing the will, as we comprehend the testimony, was $150, and he also charged $100 for his two trips to Springfield.[2] Curry's bill was paid by Lorene.

Having summarized the evidence favorable to respondents on the issue of whether they made a submissible case of undue influence (Lorene's second point), we now turn to Lorene's specific contentions on that point, of which there are three. The first, designated by Lorene as component "A," is that the uncontradicted evidence showed Vivian was in sound mental condition and knew the provisions of the will at the time she executed it. The second, designated by Lorene as component "B," is that the evidence established Vivian did not wish to give her property directly to Lena and Florence, as Vivian had concerns about their ability and competency to handle financial affairs, consequently there "was no unnatural disposition of property." The third contention in Lorene's second point will be stated and discussed *infra*.

Respondents maintain they made a submissible case on the issue of undue influence in that there was substantial evidence supporting all three elements of the presumption of undue influence set forth earlier: (1) a confidential or fiduciary relationship between testator and beneficiary, (2) a substantial bequest to the beneficiary, and

---

**2.** Curry's bill was received in evidence at trial, but it has not been included in the record on appeal, nor has it been filed with us as an exhibit.

(3) the beneficiary was active in procuring the execution of the will. As already explained, when supported by substantial evidence the presumption makes a prima facie case that the testator was unduly influenced by the beneficiary, which does not disappear upon the introduction of rebutting testimony but presents an issue for the jury.

■■■ As to the first element of the presumption (a confidential or fiduciary relationship between testator and beneficiary), the evidence showed that Vivian gave Lorene a power of attorney authorizing Lorene to handle Vivian's business, that Vivian was assisted by Lorene in the preparation of Vivian's income tax returns, and that Vivian (according to Curry) trusted Lorene. A confidential relationship exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other; the question in such case is always whether or not trust is reposed. *Hodges*, 692 S.W.2d at 377[23]. With respect to the existence of a confidential relationship between Vivian and Lorene, Lorene's counsel stated to the trial judge at the conclusion of respondents' evidence: "[O]n the theory of undue influence, there's the element of confidential relationship. That, I would say, is a jury question at this point."

We agree, and hold that there was sufficient evidence to support a finding that a confidential relationship existed between Vivian and Lorene at the time Vivian executed the purported will.

As to the second element of the presumption (a substantial bequest in the will to the beneficiary), Vivian's purported will bequeathed her entire estate to Lorene.[3] At the conclusion of respondents' evidence Lorene's counsel conceded to the trial judge that Lorene had been given a substantial bequest by Vivian's will. Lorene makes the same concession in her brief. The second element of the presumption is thus clearly established and is not in dispute.

■■■ As to the third element of the presumption (the beneficiary was active in procuring the execution of the will), we have seen that it was Lorene's husband, Dallas Chambers, who initially contacted attorney Curry about going to Cox South hospital to see Vivian about a will. We have also learned that prior to the preparation of the will Lorene told Fay Humbyrd that Vivian needed a will. Additionally, after Vivian refused to sign the will when it was presented to her by Curry, it was Dallas Chambers who picked up the unexecuted will several days later at Curry's office and carried it to Cox South hospital, where he informed Reverend Abbott that Vivian was ready to sign it. Finally, it was Lorene who paid Curry for his services regarding the will.

We have not overlooked Dallas Chambers' testimony that Vivian selected attorney Curry to prepare the will, and that he (Dallas) was asked by Vivian to contact Curry. The jury, however, was not required to believe that testimony. The jury was the sole judge of the credibility of the witnesses and the weight and value of their testimony, and could believe or disbelieve any portion of such testimony. *Thayer v. Sommer*, 356 S.W.2d 72, 77[6] (Mo.1962); *Lewis v. Envirotech Corp.*, 674 S.W.2d 105, 111[4] (Mo.App.1984). Furthermore, resolution of Lorene's second point requires only a determination of whether the evidence made a submissible case on the issue of undue influence and, as emphasized earlier, on that question we accept respondents' evidence as true and disregard Lorene's evidence except as it aids respondents. We hold that the evidence, measured by the above standard, was sufficient to support a finding that Lorene was active in procuring the execution of the will. We therefore rule there was substantial evidence to support all three of the elements required to give rise to a pre-

3. The inventory of Vivian's estate was received in evidence at trial, but it has not been included in the record on appeal, nor has it been filed with us as an exhibit. We are thus uninformed of the appraised value of Vivian's estate.

sumption that Vivian was unduly influenced by Lorene.

Lorene, in her brief, acknowledges that the evidence "may support the traditional presumption of the existence of undue influence," but Lorene insists there was no evidence that she *exercised* any undue influence on Vivian that led Vivian to execute the will. Citing *Glover v. Bruce*, 265 S.W. 2d 346, 353[9] (Mo.1954), Lorene reminds us it is not the existence of undue influence but the exercise of it in the execution of the will which invalidates such will.

Lorene directs us to *Simmons v. Inman*, 471 S.W.2d 203, 206–07 (Mo.1971), where it is said:

> "Several factors have been recognized in determining whether undue influence has been exercised; e.g., evidence of the mental and physical condition of the testatrix bears on her state of mind and susceptibility to undue influence, evidence of power to influence the testatrix and opportunity of the beneficiary to do so is properly considered, another consideration is whether the will makes an unnatural disposition of property, yet another is whether the bequest to the fiduciary was a sudden change from a former will, and the presence of the beneficiary or even the exertion of his influence at the exact moment of execution need not be shown." (Citations omitted.)

Lorene asserts the uncontradicted evidence was that Vivian was in good mental condition and was fully aware of the provisions of the will when she executed it. Additionally, says Lorene, there was no evidence that the bequest to her constituted a change from a former will. Thus, according to Lorene, two of the factors in *Simmons* are in her favor.

Furthermore, argues Lorene, the evidence established that Vivian's purported will was not an unnatural disposition of Vivian's property. Lorene proclaims, "The evidence was that Lena was not capable of handling her own affairs, but that all of her business was handled by Reverend Abbott."

That declaration is a misstatement of the evidence. There was absolutely no evidence that Reverend *Abbott* handled any business for Lena. What Lorene is apparently referring to is the testimony of Nan Mothes that Reverend *Humbyrd* handled Lena's business, and testimony by Fay Humbyrd, Reverend Humbyrd's wife, that she and he had taken Lena's checks to the bank for her "and bought her groceries and things like that."

■ Lorene emphasizes that she testified Vivian was concerned that Lena was not mentally capable of handling business and that if someone could get Lena to sign checks they would wipe Vivian out. That testimony, says Lorene, coupled with the understanding that she would use Vivian's assets to care for Lena and Florence, demonstrated that Vivian's bequest of her entire estate to Lorene was not an unnatural disposition.

We remind Lorene that the credibility of her testimony, like all other testimony in the case, was for the jury to determine. Accordingly, we cannot decide Lorene's second point on the assumption that her testimony was true. Furthermore, Lorene's contention that the understanding that she would use Vivian's assets to care for Lena and Florence established that the bequest to Lorene was not an unnatural disposition of Vivian's property ignores Lorene's testimony that she (1) never had any discussion with Vivian about using Vivian's assets to take care of Lena and Florence, and (2) said nothing in the presence of Reverend Abbott or nurse Estes about seeing that Vivian's money would be used to take care of Lena and Florence.

Given the overwhelming evidence that Vivian's objective for some 20 years had been to ensure that Lena and Florence were provided for, we reject Lorene's thesis that the evidence compelled a finding that the bequest to her of all of Vivian's estate was not an unnatural disposition.

■ Additionally, one must understand that a finding of undue influence does not absolutely depend upon establishment of the three-element presumption discussed earlier. *Hodges*, 692 S.W.2d at 378. A finding of undue influence can be based

on other facts and circumstances if they are sufficient to permit a reasonable inference of undue influence. *Id.* On that subject we have summarized evidence from which the jury could have reasonably found that (a) Vivian had virtually no contact with Lorene until the onset of Vivian's final illness in January, 1986, (b) Lorene embarked on a course of conduct calculated to convince Vivian and others that Lena had never loved Vivian, and to cultivate affection by Vivian toward Lorene and her mother, Alta Moore, and (c) Lorene undertook to isolate Vivian from contact with others by dismissing nurses who had been scheduled to care for Vivian when she returned home after her first hospitalization, by moving Lorene's mother into Vivian's home at that time, by refusing to allow callers to speak to Vivian on the telephone, and by remaining present when others visited Vivian at the hospital. The extent of Lorene's influence over Vivian during the final weeks of Vivian's life is poignantly illustrated by the incident at the nursing home on March 1, 1986, when Vivian rejected the suggestion that she pull the curtains so she could see her roommate, saying Lorene had told her not to. It is also noteworthy that Vivian, when the will was presented to her by attorney Curry, was, according to Reverend Abbott, unwilling to sign it because Lena and Florence were not beneficiaries. When Dallas Chambers, some days later, handed the will to Reverend Abbott and stated Vivian was ready to sign it, Reverend Abbott, according to his testimony, talked to Vivian and was told by her that Lorene had promised she would use all Vivian's assets to take care of Lena and Florence. The jury could properly infer from that testimony that Lorene, during the interval between Vivian's initial refusal to sign the will and the date she signed it, had influenced Vivian to do so by assuring her that she (Lorene) would use Vivian's assets for such purpose.

For the foregoing reasons we reject components "A" and "B" of Lorene's second point.

The third contention in Lorene's second point, designated by her as component "C," avers respondents failed to make a submissible case of undue influence in that the evidence of Lorene's dealings with Vivian's bank accounts and property show that Lorene "has acted consistently in accordance with [Vivian's] expressed intentions to give [Lorene] her property to use for the benefit of [Lena and Florence], but that [Lorene] has been prevented from doing so by [respondents'] own actions." Lorene bases the contention on evidence that after Vivian's death Mildred Gott, at Lena's request, phoned Lorene "not to come around because she didn't like the way she treated her." Lorene maintains she was ostracized after Vivian's death and "was prevented from caring for or assisting either Lena or Florence, for whatever reason, by Lena and her friends." Despite this, says Lorene, the evidence showed that as of the time of trial she had taken no action to use or deplete Vivian's bank accounts.

■ Again, we remind Lorene that her second point hinges not on whether there was evidence from which the jury could have found that Vivian's will was not the product of undue influence by Lorene, but instead on whether there was sufficient evidence for submission of the issue of undue influence to the jury. We concluded earlier that there was substantial evidence to support all three elements required to give rise to a presumption that Vivian was unduly influenced by Lorene. That presumption, coupled with the other evidence listed in our discussion of Lorene's second point, was more than ample to warrant submission to the jury of the issue of whether Vivian signed her purported will as a result of undue influence by Lorene. The arguments advanced by Lorene in support of component "C" of her second point should have been—and perhaps were—presented to the jury.[4] They supply no basis, however, for convicting the trial court of reversible error. Lorene's second point is denied.

■ Lorene's first point, as noted at the outset of this opinion, avers the trial court

---

4. The transcript does not contain the jury arguments.

erred in giving instructions 8 and 4 to the jury. The frailty in the point is that it has not been preserved for appellate review.

The conference between the trial court and counsel regarding instructions, Rule 70.02(a), Missouri Rules of Civil Procedure (18th ed. 1987), if there were one, is not contained in the transcript, and it is inferable that any discussion regarding instructions was "off the record" by consent of the parties. Lorene's counsel registered no objection to any instruction given by the trial court. Furthermore, Lorene's motion for new trial made no mention of instructions 8 or 4, nor did it assign error in the submission to the jury of the issues framed by those instructions.

Rule 70.03 provides, in pertinent part: "Specific objections to instructions shall be required in motions for new trial unless made at trial."

Rule 78.07 provides, in pertinent part: "In jury tried cases ... allegations of error to be preserved for appellate review must be included in a motion for a new trial.... Where definite objections ... were made during the trial ... including specific objections to instructions, a general statement in the motion of any allegations of error based thereon is sufficient. Any specific objections to instructions which were not made at the trial before submission to the jury, must be set forth in the motion for new trial to preserve the error for review...."

In *State ex rel. State Highway Commission v. Galeener*, 402 S.W.2d 336 (Mo. 1966), the Commission complained on appeal about the giving of an instruction. The Supreme Court of Missouri held that inasmuch as the Commission made no specific objection to the instruction when it was offered and failed to mention the instruction in the motion for new trial, any error regarding the instruction was not preserved for appellate review. *Id.* at 342[12].

In *Associates Discount Corp. v. Isgriggs*, 431 S.W.2d 694 (Mo.App.1968), the appealing party complained about the giving of an instruction. The appellate court, observing that the allegation of error was not contained in the motion for new trial and the objection was not specifically stated when the instruction was offered, held the point was not preserved for review. *Id.* at 694–95[1].

■■■ Lorene, in her brief, recognizes the preservation problem. She argues, however, that her first point has been preserved for review under the holding in *Hodges*, 692 S.W.2d at 375–76.

Her reliance is misplaced. In *Hodges*, the proponent made a prima facie case of due execution and a prima facie case of testamentary capacity, and the contestants failed to present substantial contradictory evidence on either issue. *Id.* at 375. The proponent, at the close of all the evidence, moved for a directed verdict that the purported will was the testator's last will and testament. The motion averred that the evidence showed the purported will was properly executed and that the testator, at time of execution, was of sound and disposing mind and memory. 692 S.W.2d at 365. The trial court denied the motion and gave instructions submitting those issues (along with the issue of undue influence) to the jury, which found in favor of the contestants. *Id.* In a motion for judgment notwithstanding the verdict the proponent asserted the uncontradicted evidence showed the testator executed the purported will in compliance with Missouri law and that there was no evidence he lacked testamentary capacity when he did so. *Id.* at 366. The proponent incorporated that allegation in a motion for new trial. *Id.* On appeal the proponent charged the trial court with error in submitting the issues of due execution and testamentary capacity to the jury. The opinion in *Hodges* noted that the proponent made the trial court aware of her objection to the submission of those issues to the jury at the close of all the evidence, but the trial court nonetheless decided to submit them. *Id.* at 375. Once the trial court had made that decision, the proponent furnished the trial court an instruction correctly submitting such issues. The opinion in *Hodges* concluded that in such circumstances the proponent was not barred from complaining on appeal about

the giving of the instruction, observing that when the trial court decided to submit such issues it was in the proponent's interest to ensure they were submitted by a correct instruction so that if she won the verdict it would be immune from attack for instructional error. *Id.* at 376.

Circumstances comparable to those in *Hodges* do not exist in the instant case. Respondents, in the amended petition on which the case was tried, averred, among other things, that Vivian's purported will was procured by undue influence and by fraud. At the conclusion of respondents' evidence Lorene's counsel moved for a directed verdict on the issues of undue influence and fraud. The issues of due execution and testamentary capacity were not mentioned during the argument on Lorene's motion. At the conclusion of all the evidence Lorene's counsel renewed the motion for a directed verdict stating, "My argument is the same grounds that I had on the argument for directed verdict at the close of [respondents'] case."

As noted earlier, Lorene's counsel voiced no objection to any instruction given by the trial court, and Lorene's motion for new trial ignored instructions 8 and 4 and assigned no error in the submission to the jury of the issues framed by them. As respondents point out in their brief, one needs only to review the transcript and legal file to conclude that any claim of instructional error regarding submission of the issues of due execution and testamentary capacity were raised for the first time in Lorene's brief.

Endeavoring to demonstrate that her first point was preserved for review, Lorene directs our attention to the following segment of the trial court's order denying Lorene's motion for new trial: "The court has read *Maurath v. Sickles*, 586 S.W.2d 723, (Mo.App.E.D.1979), which was cited by [Lorene]." Lorene maintains this excerpt shows that sufficiency of the evidence on testamentary capacity and due execution was argued to the trial court and considered by it. Therefore, says Lorene, the

error in giving instructions 8 and 4 is properly before us in this appeal.

Lorene's argument, while ingenious, is unavailing. In *Maurath* the trial court submitted the issues of due execution, testamentary capacity, and undue influence to the jury, which returned a verdict in favor of the contestants. The appellate court held that none of those issues should have been submitted, and reversed with directions to enter a judgment for the proponents. Lorene's motion for new trial averred the trial court erred in refusing to direct a verdict in Lorene's favor. She would have been entitled to a directed verdict only if, among other things, respondents had failed to make a submissible case on the issue of undue influence. *Maurath* is just as germane to that subject as it is to Lorene's first point. Consequently, we cannot assume that Lorene cited *Maurath* to the trial court in support of a contention that the trial court erred in giving instructions 8 and 4.[5]

*Hodges,* 692 S.W.2d at 366[4], holds that where the proponent makes a prima facie case of due execution and testamentary capacity, and the contestant fails to adduce substantial contradictory evidence on either issue, such issues should not be submitted to the jury and it is reversible error to do so *over the proponent's objection.* As noted earlier, nothing in the record before us establishes that Lorene ever registered any objection in the trial court to the submission of those issues to the jury. Her first point is thus ineligible for appellate review.

■ In a final effort to obtain reversal Lorene implores us to accord her first point plain error review under Rule 84.13(c). That rule authorizes us, in the exercise of discretion, to consider plain errors affecting substantial rights, though not preserved, when we find that manifest injustice or miscarriage of justice has resulted therefrom.

No manifest injustice or miscarriage of justice is demonstrated by the record before us. Instructions 8 and 4 correctly declared the law on due execution and tes-

---

5. The argument on Lorene's motion for new trial does not appear in the transcript.

tamentary capacity. All of the evidence regarding execution of Vivian's purported will showed that the ritual required by Missouri law was followed, and all of the evidence concerning Vivian indicated she was of sound and disposing mind and memory. There was but one issue on which the evidence conflicted: the issue of undue influence. We are consequently unpersuaded that the giving of instructions 8 and 4 resulted in manifest injustice or a miscarriage of justice. Lorene's first point is denied and the judgment is affirmed.

FLANIGAN and GREENE, JJ., concur.

HOLSTEIN, C.J., recused.